## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

CAROL A. THOMAS,

MAR 1 3 2014

Plaintiff,

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

v.

Civil Action No. 3:13CV56
(The Honorable Gina M. Groh)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

## REPORT AND RECOMMENDATION/OPINION

Carol A. Thomas ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 27, 2010, alleging disability due to anxiety, depression, and post traumatic stress disorder ("PTSD") (R. 134, 155). Plaintiff's applications were denied at the initial and reconsideration levels (R. 84-85). Plaintiff requested a hearing, which Administrative Law Judge Daniel F. Cusick ("ALJ") held on March 9, 2012. Plaintiff, represented by counsel, Eileen Goodin, testified on her own behalf. Also testifying was Vocational Expert ("VE") Larry Ostrowski (R. 31-75). On March 23, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 16-26). On April 15, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. FACTS

Plaintiff was born on December 15, 1953, and was fifty-eight (58) years old at the time of the administrative hearing (R. 25). Plaintiff earned a general equivalency diploma ("GED") and had specialized training in asbestos removal (R. 40, 156). Her previous jobs were department store packer, bartender, fast food cook, and gambling cashier (R. 43-48, 156-57, 170-71, 199).

Plaintiff was admitted to the Crisis Stabilization Unit at Northwood Health Systems ("Northwood") on April 20, 2009, for depression, anger, frustration, lack of sleep, poor concentration, tearfulness, helplessness, and poor appetite caused by the death of her grandson; she was diagnosed with major depression, recurrent and moderate. Her global assessment of functioning ("GAF") was twenty-five (25) (R. 217, 222, 224). Dr. Corder ordered group therapy, individual therapy, staff assessments and intervention, and treatment/discharge planning (R. 223). An individual treatment plan was devised for Plaintiff (R. 208). The goal for Plaintiff was to alleviate her grief , feel like she was not alone, not cry "all the time," "be there for [her] kids and grand kids," work, and care for herself (R. 209-10).

A mental health professional at Northwood found, on April 21, 2009, that Plaintiff was grieving because of the death of her grandson. Plaintiff felt she could "not function" and was tearful, nervous, scared, distraught, overwhelmed, confused, angry, and "rocking." Plaintiff was concerned about losing her job because she could not work. She felt hopeless and had flashbacks and nightmares about her grandson's death (R. 265-66, 283, 347). Plaintiff had no suicidal thoughts because her "other" children "need[ed] her." Plaintiff was diabetic (R. 283). Plaintiff's GAF was twenty-five (25). She was diagnosed with bereavement; polysubstance dependence "full sustained remission"; major depression, recurrent; and anxiety (R. 284, 348).

On April 22, 2009, a mental health professional at Northwood noted Plaintiff slept well, felt less anxious, was calmer, was more hopeful, and was less overwhelmed. Plaintiff worried that others would die; she worried about losing her job. Plaintiff attended group therapy (R. 263-64). Plaintiff had symptoms of depression and anxiety. Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She had no suicidal or homicidal plans, hallucinations, or delusions. Her affect was blunted; her mood was depressed (R. 345). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 346).

On April 23, 2009, a mental health professional at Northwood noted Plaintiff was irritated, isolated, sleeping poorly, uptight, tearful, anxious, and worried. Plaintiff stated she was depressed and sad but those symptoms did not "last[] all day long." She was "rocking" and had racing thoughts. She attended group therapy (R.261-62). Plaintiff stated her medication was "helping." She was not motivated to "do anything." Plaintiff stated she was socializing "more" and that her concentration was "improving." Her GAF was twenty-five (25) (R. 281). It was noted Plaintiff was improving (R. 282). Plaintiff had symptoms of depression and anxiety. Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She had no suicidal or homicidal plans, hallucinations, or delusions. Her affect was blunted; her mood was dysphoric (R. 343). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 344).

Ms. Flowers, of Northwood, completed a daily assessment of Plaintiff on April 24, 2009. She had been "socializing." She was irritable and not sleeping well. Plaintiff stated her concentration was poor because she was "not sleeping much." She was depressed and overwhelmed. Her affect was blunted, she was tearful, she was not motivated and had low energy. Her medication was starting "to help." She worried (R. 259-60). Plaintiff had symptoms of depression and anxiety.

Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She had no suicidal or homicidal plans, hallucinations, or delusions (R. 341). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 342).

A mental health professional at Northwood completed a daily assessment of Plaintiff on April 25, 2009. Plaintiff was irritable and tense. She interacted with others on a limited basis. She was easily distracted, depressed, tearful, disheveled, and restless. She slept poorly. It was noted she was preoccupied with her grandson's death and lacked insight to her symptoms. She stated her medications were "not working." She attended group therapy (R. 257-58). Her presenting problems were depression and anger. Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She had no suicidal or homicidal plans, hallucinations, or delusions. Her affect was blunted; her mood was anxious and depressed. She was oriented, times four (4) (R. 339). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 340).

A mental health professional at Northwood completed a daily assessment of Plaintiff on April 26, 2009. Plaintiff had slept better, was less overwhelmed, had some anxiety, was "edgy," had grief issues, was restless, was worried, and had no motivation. Plaintiff was socializing more. Her mood was depressed and anxious. Her affect was blunted. Plaintiff stated her medications were beginning to alleviate her symptoms (R. 255-56). She was tearful. Her presenting problem was "grief." Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She was oriented, times four (4). She had no suicidal or homicidal plans, hallucinations, or delusion (R. 337). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 338).

A mental health professional at Northwood completed a daily assessment of Plaintiff on April 27, 2009. Plaintiff was restless, overwhelmed, nervous, tearful, distressed, tired, irritated, and

anxious. Plaintiff had "very rapid mood shifts minute to minute." She felt "just as bad" as when she was admitted. She had negative feelings. She could sleep all day (R. 253-54). Plaintiff stayed up late and was tired during the day. Sleeping let her "avoid coping w/negative feelings." She was not "lashing out" at others. Her GAF was twenty-six (26) (R. 279). Plaintiff symptoms were "depression [and] anxiety." Her appearance, posture, gait, speech, eye contact, and motor activity were normal. Her affect was blunted; her mood was depressed. She was oriented, times four (4) (R. 335). It was noted she was making progress toward crisis resolution and was improving (R. 280, 336).

A mental health professional at Northwood completed a daily assessment of Plaintiff on April 28, 2009. Plaintiff felt edgy, overwhelmed, and depressed. She had decreased crying spells; she slept better. She was preoccupied with her grandson's death. She had no energy, felt hopeless, was negative, had no interests, was irritable, had difficulty concentrating, and was restless. She was "rocking" less. Plaintiff stated she knew what she needed to do, "but just [could not] put it together." She had to force herself to get out of bed. She was afraid to go home (R. 251-52). She had symptoms of grief and depression. It was noted Plaintiff's appearance, posture, gait, and motor activity were normal. Her affect was blunted and mood depressed. She was oriented. Her speech and eye contact were normal. She had no suicidal or homicidal plans, hallucinations, or delusions (R. 333) It was noted she was making relevant progress toward crisis resolution (R. 334).

On April 29, 2009, a daily assessment was completed on Plaintiff at Northwood. She was upset, was irritated, was distracted, was depressed, was sad, was anxious, felt hopeless, had no energy, had lack of interest, felt nervous, and had panic attacks. She had no suicidal ideations. She had bad dreams. She wanted to stay in bed all day and had to force herself to get up. Her medications were working "some." She became tearful and distraught after a group discussion of

5

a book and movie in which there was a death (R. 249-50). She felt "'numb emotionally'" and disoriented. She hit the wall with her fists and growled. She had mood swings. Her GAF was twenty-six (26) (R. 277). Her appearance, posture, gait, and motor activity were normal; affect was blunted; mood was anxious and depressed; speech was normal; and eye contact was fleeting. She had no suicidal or homicidal plans, hallucinations, or delusions. She was diagnosed with grief, guilt, and depression (R. 331). It was noted she was making progress toward crisis resolution and was improving (R. 278, 332).

Plaintiff reported to a mental health professional at Northwood on April 30, 2009, that her symptoms went "up and down." She did not feel ready to go home because she felt withdrawn from people. Plaintiff reported she was starting to feel "not so mad at God anymore" due to the death of her grandson, and it made her feel better to "text messages" him. Her daughter continued to pay her grandson's cell phone bill and put it in the casket with him. It made her "feel so much better when her phone says message sent" after she texted him. She had poor concentration, was tearful, was distracted, was preoccupied, and had depression. She attended group therapy (R. 247-48). Plaintiff was diagnosed with grief and depression. Her affect was blunted, mood depressed, and speech normal. She was not homicidal or suicidal. She had no delusions or hallucinations (R. 307).

On May 1, 2009, Plaintiff reported to a mental health professional at Northwood that she was overwhelmed, afraid to get up in the morning, afraid to go home, had increased anger, was easily distracted, had racing thoughts, was depressed, and had panic attacks (R. 245-46, 275-76). Plaintiff was diagnosed with depression, anxiety, and grief. Her affect was blunted; her mood was anxious and depressed. She was not homicidal, suicidal, delusional, or hallucinating (R. 305). Plaintiff's GAF was twenty-six (26). She was tearful. She said the crisis intervention center was "saving" her

6

life.  Plaintiff was making relevant progress toward crisis resolution (R. 275-76, 306).

Plaintiff's May 2, 2009, daily assessment at Northwood read that she was upset and angry. She had mood wings.  She was earful, confused, and isolated.  She was depressed over the death of her grandson.  Her affect was blunted.  She had a lack of motivation and energy.  She was tense and restless.  It was noted Plaintiff lacked insight into her illness.  She was sleeping better (R. 243-44). Plaintiff was diagnosed with depression and anxiety.  Her mood was labile; her affect was blunted. She had no homicidal or suicidal plans.  She was not delusional.  She did not hallucinate (R. 303). Plaintiff was making relevant progress toward crisis resolution (R. 304).

Ms. Flower completed a daily assessment of Plaintiff on May 3, 2009, at Northwood.  She found Plaintiff was upset, was irritable, was depressed, was shaking, had strained affect, interacted less, was crying, and made limited eye contact.  Plaintiff reported poor concentration, not being motivated, and relationship issues due to past abuse.  She felt grief over the death of her grandson. She was anxious and overwhelmed.  She was sleeping "okay."  She attended group therapy.  She was taking her medications as administered (R. 241-42).  Her affect was blunted and mood was dysphoric. She was not suicidal, homicidal, delusional, or hallucinating (R. 301).  Plaintiff was making relevant progress toward crisis resolution (R. 302).

On May 4, 2009, Plaintiff stated to a mental health professional at Northwood that she had not used drugs for six (6) years.  She was on probation and had been jailed for one (1) year for aiding and abetting in the distribution of cocaine and marijuana (R. 240).  Plaintiff stated she was angry, but she did not display violent behavior.  She had passive suicidal ideations.  She had limited interaction with others.  She heard voices.  She stated her concentration was impaired, she was distracted, and she had racing thoughts.  Plaintiff stated she had been depressed since the death of

her grandson; she felt sad, helpless, hopeless, tired, unmotivated, irritable, and overwhelmed. She reported she had a panic attack. She ate limited portions of her meals. She attended group therapy. She stated her medications, except Vistaril, were "helping" (R. 240). She was diagnosed with depression and "grief issues." Her affect was blunted and mood was depressed (R. 299). Plaintiff was making relevant progress toward crisis resolution (R. 300).

The daily assessment of Plaintiff on May 5, 2009, by a mental health professional at Northwood read that Plaintiff was overwhelmed and tearful. Her emotions fluctuated. She felt helpless, was agitated, rocked and wrung her hands, was anxious, was angry, was depressed, was sad, and was disheveled. Plaintiff stated she had been abused by her brothers and uncles. She hallucinated. She stated she could not "go to jail." Plaintiff stated she worried about meeting a deadline for parole. Her appetite was abnormal; she had low energy. She would not commit suicide because of her children and grandchildren. She felt panic symptoms. She was nauseous, tired, and drained. She reported her medications were alleviating her symptoms "some." She participated in group therapy (R. 237-38, 273-74). Her GAF was twenty-six (26). It was noted Plaintiff was making progress toward crisis resolution (R. 273-74). She was diagnosed with depression, anxiety, and grief. Her affect was blunted and her mood was depressed. She had no homicidal or suicidal thoughts, hallucinations, or delusions (R. 297).

Plaintiff reported to Ms. Flowers, of Northwood, on May 6, 2009, that she did not kill herself because of her children and grand children. She reported she was irritable, angry, agitated, and tense. She had mood swings and wanted to be isolated. She heard voices. She had poor concentration; she appeared distracted; she had limited eye contact; and she had feelings of hopelessness and helplessness. Her affect was strained and mood was depressed. She had low energy. Plaintiff felt

another family member could die. Plaintiff was tearful (R. 235). Plaintiff reported she made bad decisions; she gambled. She had nightmares. She had difficulty eating. She stated her medications were working "somewhat." She attended most of her group therapy sessions (R. 236). It was noted Plaintiff was sleeping better. She was diagnosed with depression and grief (R. 295). It was noted she was making relevant progress toward crisis resolution (R. 296).

On May 7, 2009, Plaintiff reported to a mental health professional at Northwood that her grief was lessening. Plaintiff stated she feared being discharged and returning to her home because her "bedroom . . . [had] no windows, and it's pitch black when lights are out" and that was when she would "see [her] grandson's face and [she would] get depressed all over again." She felt sad for her daughter because Mother's Day was approaching (R. 234). Her GAF was twenty-nine (29) (R. 271). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 272). She was diagnosed with depression and grief (R. 293).

On May 8, 2009, Ms. Flowers, of Northwood, noted Plaintiff felt irritated and upset. Plaintiff stated she could "blow up, yell" and act violently just as she did when she "used to drink & do drugs." Plaintiff was socializing, but was concerned about how she would "do once discharged." She was tense, heard voices, appeared distracted, had difficulty paying attention, felt sad and depressed over the death of her grandson, was worried about her daughter, had no energy, lacked motivation, had relationship issues, was tearful, felt anxious and uptight, was nervous, was worried, and had fewer panic attacks (R. 231, 291). Plaintiff reported she made bad decisions and spent money "excessively." Plaintiff's appetite was poor; she slept well but was still tired. Plaintiff was afraid to be discharged. Ms. Flowers noted Plaintiff lacked insight to her condition and displayed low levels of motivation. Plaintiff stated her medication was "working 'okay'" (R. 232).

9

A mental health professional at Northwood completed a functional impairment assessment of Plaintiff on May 9, 2009. She stated she was trying to stay calm and control her anger. She was less easily upset and irritable. She stated she was easily distracted; her mind wandered; she had racing thought; she had difficulty with her memory. She felt depressed, tired, drained, and achy. She was reliving issues of past abuse; she did not feel she could care for herself; it was difficult for her to talk about her grief. She was less tearful and disheveled. Her mood was somber; her affect was blunted; she had decreased appetite. She felt anxious and worried; she had no panic attacks (R. 229). Plaintiff's sleep was better, but she was still tired. Plaintiff stated she was afraid of leaving Northwood; her medications were helping (R. 230). It was noted that Plaintiff was not as depressed. Her motor activity and gait were normal; her affect was appropriate and her mood was anxious; her eye contact was fleeting; and her hallucinations had been resolved (R. 289).

Ms. Flowers noted, on May 10, 2009, that Plaintiff reported feeling "a little" irritable and upset. She was tense. She was interacting more. She made limited eye contact. She had hallucinations. She had poor concentration; she was easily distracted; she had racing thoughts; her mind wandered; she had difficulty with memory. She continued to grieve over the death of her grandson. She felt sad for her daughter, because it was Mother's Day. She reported she had low self esteem and no energy. Plaintiff's affect was blunted; she was less tearful; she displayed low levels of motivation and energy. She was anxious, nervous, and worried. She appeared to be tense, uptight, and restless (R. 227). Plaintiff stated she felt "a little better" and thought "she would be ok if discharged" (R. 228). She was diagnosed with depression and anxiety. Her appearance, posture, gait, motor activity, and affect were normal. Her mood was euthymic. She was not homicidal or suicidal. She did not have delusions. She had a visual hallucination; "last night saw chandelier in

room" (R. 287). It was noted Plaintiff was making relevant progress toward crisis resolution; however, her symptoms had not been resolved (R. 288).

On May 11, 2009, a licensed practical nurse at Northwood noted Plaintiff was not suicidal or homicidal and did not have delusions, paranoia, or mania. Plaintiff had mild hostility, hallucinations, and sleep irregularities. She was not compliant with taking her medications. Plaintiff stated her energy and motivation were increasing. Plaintiff was socially withdrawn, had poor concentration, had anxiety, and had appetite changes. Plaintiff had moderate symptoms of depression. She stated she was having "a little" depression. She was less tearful, she made eye contact, she showed low levels of motivation and energy (R. 225-26). It was noted that Plaintiff was making relevant progress toward crisis resolution (R. 270). Upon examination, it was noted that Plaintiff was less overwhelmed, was less depressed, had less anxiety, and was less angry. Her appearance was appropriate; her posture and gait were normal; her motor activity was normal; her affect was blunted; her mood was depressed; she was oriented, times four (4); her speech was normal; she had no homicidal or suicidal ideations; she had no hallucinations or delusions. She was diagnosed with depression and grief (R. 285). She required "intensive monitoring/medical supervision." She needed to continue crisis stabilization services and medication (R. 286).

On May 12, 2009, an examination was completed of Plaintiff at Northwood. Her anxiety was reduced; her depression was decreased. She was less tearful. Plaintiff stated her medications were "'really working.'" She stated she would experience "'up and down days'" because it took "'a long time for grief but [she] [had] faith [she would] be okay.'" She felt more positive. She was going to attend grief counseling at her church. She desired to spend time with her grandchildren. Her sleep was improved; her appetite had increased; her concentration had improved. Her GAF was

11

thirty-five (35) (R. 267). She was discharged from Northwood because the treatment objectives had been met. She was instructed to continue pharmacological management, individual therapy, and support counseling (R. 216).

Plaintiff presented to Wheeling Health Right on May 12, 2009, for a medication check. Plaintiff reported she had been a patient at Northwood due to depression and "having difficulty getting out of bed" due to the death of her grandson. Plaintiff reported she was sleeping well; her appetite was good; she had no suicidal thoughts or hallucinations. Upon examination, Physician Assistant ("P.A.") Edwards found Plaintiff was positive for depression. She became tearful when discussing the death of her grandson. Plaintiff was assessed with depression, diabetes, and hyperlipidemia. Plaintiff was instructed to continue taking her current medications as prescribed (R. 316).

Physician Assistant Edwards examined Plaintiff on June 15, 2009. Plaintiff stated she "still not doing well with the death of her grandson . . . ." Plaintiff was tearful. She "express[ed] concern about having to go back to work." She was not sleeping well. Plaintiff attended church. She listened to gospel music, which was a "source of comfort." She had "several people in her life" in whom she confided. Plaintiff had "stopped taking all of her medications because she 'was feeling so good.'" Her physical examination was normal; she was depressed. P.A. Edwards assessed "bereavement." Plaintiff was instructed to take her prescribed medications and return in one (1) week (R. 309).

Plaintiff's July 6, 2009, individual therapy progress note by Meredith Finsley, at Northwood, read she was moderately to severely depressed. She cried frequently. Plaintiff stated she was "dealing with a lot of grief issues over losing he[r] grandson." Plaintiff stated she lacked motivation

and energy. She intended to go to another grandson's ball game. Her appearance was unkempt, hygiene poor, speech rapid, affect blunted, and mood depressed. She had suicidal ideations (R. 349). During the session, Ms. Finsley found Plaintiff was active. She had limited insight. Plaintiff realized she needed to "make herself do things." She realized she needed to "focus on the 14 grand children (sic) that she has." Her progress was minimal (R. 350).

Ms. Finsley, of Northwood, noted, in Plaintiff's July 20, 2009, individual therapy progress note, that she was unkempt, had poor hygiene, had rapid speech, had depressed mood, and had blunted affect. Plaintiff reported she had been "doing somewhat better and not crying all the time." She had no energy or motivation. She forced herself to do things. She didn't want to get out of bed. Her grief and depression were "slightly better." Plaintiff attended her grandson's game. She had medical symptoms that "contributed to her depression" (R. 351). Ms. Finsley found Plaintiff was motivated for therapy, but she had poor insight and follow through to reduce her anxiety. Plaintiff's progress was minimal (R. 352).

On August 6, 2009, it was reported at Northwood that Plaintiff stated she was "easy going" and denied anger or irritability. She was quiet and withdrawn and had no suicidal or homicidal thoughts or hallucinations or delusions. She reported poor concentration and depression due to her grandson's death. She was not anxious but seemed nervous (R. 380). She consumed the "majority" of her meals. Plaintiff stated she was motivated to "get better and that her family [was] her coping tool." She participated in group therapy and did not know "if the meds" were working (R. 381).

On August 13, 2009, Plaintiff was admitted to the crisis stabilization unit at Northwood. Plaintiff reported acute anxiety; severe depression; feelings of worthlessness, hopelessness, helplessness; crying; low energy; poor concentration; withdrawal; agitation; impulsivity; loss of

interest in activities; poor judgment; blunted affect; and decreased sleep.  She had racing thoughts about her deceased grandson.  Plaintiff was "not . . . on medication."  Plaintiff stated she "switched" from Health Right to Medicaid and had been "unable" to be prescribed Abilify (R. 353, 361).  Plaintiff had the support of her family (R. 357).  It was found Plaintiff had moderate limitations in her self care; mild limitations in her activities of community living; moderate limitations in her social, interpersonal, and family functioning; marked limitations in her concentration and task performance; and mild limitations in maladaptive, dangerous, and impulses behaviors (R. 359, 365).  Plaintiff's problem list included anxiety, depressed mood, death, bereavement, and coordination of services.  She was diagnosed with major depression, recurrent and moderate and PTSD (R. 360).  Plaintiff reported she was, "at times[,] not consistent with doctor's appointment because she 'only goes when [she has] to.'" Plaintiff reported "some" withdrawal from others.  Plaintiff had difficulty focusing and remembering (R. 361).  It was noted that Plaintiff was not compliant with her medication; she felt "they [caused] physical difficulties" (R. 365-66).  Plaintiff was prescribed group and individual therapy, pharmacological management, and staff intervention (R. 368).

On August 13, 2009, a medical professional at Northwood noted Plaintiff was not suicidal or homicidal.  She had no hallucinations, delusions, paranoia, or mania.  She was tense and uptight.  She did not want to socialize.  Her concentration was poor.  She was depressed and experienced grief due to the death of her grandson.  She worried about her family.  Her affect was blunted; she slept poorly; her appetite was decreased.  She felt very anxious.  She had nightmares about her grandson.  Plaintiff stated she knew she had to be at Northwood (R. 386-87).

John Thurst, Ph.D., noted, on August 13, 2009, that Plaintiff had "had medication difficulties."  She had "stopped taking her medication as they were causing side effects.  Since

stopping her medication, she [had] racing thoughts that are severe to the point her 'stomach [was] in knots'" (R. 400). Plaintiff stated that, when she is stable, she felt "hopeful and ha[d] adequate energy." She did not "generally" have racing thoughts and was "able to function." Plaintiff stated that, "at baseline, she enjoy[ed] spending time with others and being active with her children and grandchildren" (R. 412). Dr. Thurst noted Plaintiff was depressed and that condition was "complicated by grief over her grandson's death . . ." Plaintiff had no suicidal or homicidal ideations, no hostility, no signs of self injury or self neglect, no hallucinations or delusions, no loose associations, and no tangential thinking. Dr. Thurst found Plaintiff had no psychotic symptoms (R. 400). Plaintiff was positive for severe depression, acute anxiety, moderate blunted affect, severe agitation, severe loss of interest in activities, severe low energy, mild decreased appetite, moderate decreased sleep, severe poor concentration, mild thought blocking, severe withdrawal, severe impulsivity, and severe poor judgment (R. 401, 408).

On August 14, 2009, a medical professional at Northwood listed Plaintiff's diagnoses as major depression, recurrent and moderate, and PTSD. Her GAF was twenty-three (23). (R. 411). Plaintiff reported to a medical professional at Northwood that she had no suicidal or homicidal thoughts. She was irritable and socially withdrawn. She had no paranoia, hallucinations, or delusions. Her concentration was poor. She was severely depressed and overwhelmed due to grief over the death of her grandson. She was tearful, felt helpless and hopeless, was anxious, and was worried about her family. Her mind raced. She rocked back and forth (R. 384). Her appetite was decreased. She lacked motivation. She wanted to "be able to function and enjoy life." She attended group therapy. It was noted that Plaintiff stopped taking her medication because she felt they "were causing swelling." She had nightmares about returning to jail (R. 385).

Plaintiff reported to a medical professional at Northwood on August 15, 2009, that she had no suicidal or homicidal thoughts. She was hostile and "upset"; she was "not sure why" because she was "usually easy going." She did not want to socialize with others. She had no hallucinations, delusions, or paranoia. She had poor concentration and was depressed and grieved due to the death of her grandson. She worried about other family members. She was sad and overwhelmed. She was tearful (R. 382). She was not manic and had no changes in appetite. Plaintiff reported her "coping tools" were working crossword puzzles and speaking with her children. Plaintiff was attending group therapy. She had no motivation, wanted to sleep, and had no energy. She had fewer racing thoughts and was sleeping better (R. 383). Plaintiff was assessed with depression and anxiety. It was noted that Plaintiff's appearance, motor activity, posture, gait, eye contact, and speech were normal. Her affect was blunted. Her mood was anxious and depressed. She was not homicidal or suicidal; she had no delusions or hallucinations. She was oriented as to person, place, time, and situation. It was noted Plaintiff was making relevant progress toward crisis resolution (R. 406-07).

On August 16, 2009, a medical professional at Northwood noted Plaintiff had been "off meds" and depressed. Her appearance, motor activity, posture, gait, eye contact, and speech were normal. Her affect was blunted. Her mood was dysphoric. She was not homicidal or suicidal; she had no delusions or hallucinations. She was oriented as to person, place, time, and situation. It was noted Plaintiff was making relevant progress toward crisis resolution (R. 404-05).

Plaintiff reported to a medical professional at Northwood on August 17, 2009, that she did not want to wake up; she did not want to socialize; she had racing thoughts and was easily distracted. She was overwhelmed, tearful, sad, and felt hopeless and helpless. She was anxious. She worried about her family members (R. 378). She ate most of her meals. It was noted Plaintiff was negative

16

and was dwelling on the past (R. 379). Plaintiff stated she would "never be better because nothing" would change because her "'grandson [would] always be dead.'" She rocked and shook her leg. Plaintiff had difficulty socializing because she had difficulty focusing on "what others [were] saying." Plaintiff stated she did not want to wake up so she would not have to "'feel and think.'" She had thought blocking. Plaintiff's daughter was homeless and this was a "stressor" for her. She worried she could go back to jail. She had nightmares about violating her probation and being returned to jail (R. 392). Plaintiff was diagnosed with depression and excessive sleeping. Her appearance, posture, gait, motor activity, speech, and eye contact were normal. She had no suicidal or homicidal plans; she had no hallucinations or delusions. She was oriented, time four (4). Her mood was depressed; her affect was blunted (R. 402). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 403).

Plaintiff stated to a medical professional at Northwood on August 18, 2009, that she did not want to wake up. She did not want to talk to anyone. She was guarded. Her concentration was poor and she had racing thoughts. She was easily distracted. She stated she was depressed over the death of her grandson. She cried less. Her mood and affect varied. She was tense, fidgety, and rocked while she stood (R. 376). Plaintiff ate all meals. Plaintiff reported she wanted to get better. She stated she thought her medication was working; however, she "still" felt the same as when she was admitted. Plaintiff reported she did not go shopping for fear of encountering someone she knew who would tell her about his or her life, and she did not "have room in head to deal." She felt comfortable with her family (R. 377). It was noted Plaintiff's depression was severe. Her appearance, posture, gait, motor activity, eye contact, and speech were normal. She had no suicidal or homicidal plans; she had no hallucinations or delusions. Her mood was dysphoric; her affect was

blunted.  Plaintiff was oriented, times (4) (R. 398).  It was noted Plaintiff was making relevant progress toward crisis resolution (R. 399).

A medical professional at Northwood completed a crisis stabilization daily functional impairment assessment of Plaintiff on August 19, 2009.  Her presenting problems were grief, poor sleep, decreased appetite, anxiety, depression, and not taking medications. She had no suicidal plans or intentions.  She did not socialize.  Her concentration was improving.  She had fewer racing thoughts. She "appeared" to be distracted and preoccupied.  Plaintiff wanted to sleep all the time. She cried less and had improved energy.  She was less anxious.  She was restless and rocked back and forth.  Her appetite was good; she ate all three (3) meals.  She felt motivated to "get better" (R. 374-75).  Plaintiff stated her mood had improved.  She stated that Abilify "help[ed] with her symptoms."  She felt more hopeful.  She could discuss her grandson's death without becoming tearful.  Plaintiff also reported that her sleep and appetite were within normal limits.  She made an effort to socialize; she tolerated being with others "better."  Plaintiff did not rock. Plaintiff stated she had adequate support at home.  Her affect was brighter.  Her thinking was "more focused and positive" (R. 390).  Plaintiff was diagnosed with depression and anxiety.  Her appearance, posture, gait, motor activity, eye contact, and speech were normal.  Her affect was blunted; her mood was anxious and depressed.  She had no suicidal or homicidal plans; she had no hallucinations or delusions.  It was noted Plaintiff was making relevant progress toward crisis resolution (R. 396-97).

A medical professional at Northwood completed a crisis stabilization daily functional impairment assessment of Plaintiff on August 20, 2009.  She reported she was sleeping "good," had decreased agitation, was less anxious, and had decreased depression.  She had improved concentration and fewer racing thoughts.  She stated she was a sociable person, but preferred to

18

"keep to herself." It was noted she was easily distracted. Plaintiff stated the medication was "helping." She was less tearful. She continued to worry that another family member would die. She stated she felt "the best she [thought] she [could] be"; she desired to go home. She ate the majority of all three (3) meals (R. 372-73). She was diagnosed with depression and anxiety. Her appearance, posture, gait, motor activity, speech, and eye contact were normal. She had no suicidal or homicidal thoughts; she had no hallucinations or delusions. She was oriented to place, person, time, and situation. Her mood was anxious and depressed, and her affect was blunted (R. 394). It was noted Plaintiff was making relevant progress toward crisis resolution (R. 395).

Plaintiff was discharged from Northwood on August 21, 2009. Her treatment at the crisis stabilization unit was terminated because the treatment objectives had been met. She was to continue medicating with her prescribed medications (R. 364). Plaintiff stated she had not taken her prescribed medications for two (2) months prior to her treatment at Northwood. Plaintiff stated she had decreased depression when she took her medication, but she "continued to struggle over the death" of her grandson. She stated she felt "as well as she [could] while in the CSU" (R. 388). She was prescribed Prozac, Vistaril, Abilify (R. 363).

Plaintiff engaged in individual therapy with Kelly Greer, of Northwood, on August 26, 2009. Her mood was depressed and affect blunted. Ms. Greer noted Plaintiff was positive for moderate anxiety, had no suicidal or homicidal ideations, normal speech, and "significant symptoms of depression and anxiety." She did not "'enjoy anything'" and was tearful. Plaintiff did not "'go out'"; she only wanted to sleep. She wanted to feel better. Her stomach would get "'all knotted up and sick'" when she was around people. She worried about her children and grandchildren. She felt as if she were "'just going through the motions.'" She wanted to return to work but did not have

transportation; additionally, she felt her "'mind [would not] let her'" work. She had no energy and felt useless. Ms. Greer noted Plaintiff responded "positively" to therapy. Plaintiff had no "effective coping strategies" for managing depression and anxiety. She stated that the crisis stabilization unit of Northwood "was not helpful for her" and she told them "'what they wanted to hear to get discharged.'" Ms. Greer noted the death of her grandson, her financial difficulties, and thinking about having been in prison contributed to Plaintiff's anxiety and depression (R. 414-15).

Nurse Practitioner ("N.P.") Smith, of Northwood, completed a psychiatric evaluation of Plaintiff on August 31, 2009. Plaintiff reported she was "'still not feeling like'" herself. She had not felt "'normal'" since the death of her grandson. She reported feeling helpless, hopeless, and overwhelmed. She had no energy or motivation. She had no interest in "anything." Plaintiff stated it took "a lot of great effort to spend time with her grandchild." She feared something "bad" would happen to her family. She had dreams about her dead grandson and going back to prison. Plaintiff reported she was on a "leave of absence from her job" because she lacked concentration and could not "function." She felt "powerless to change how she" felt. Plaintiff did not want to go to the store because she did not want to "run into anyone she" knew. She isolated herself; she stayed in bed all day on some days. Plaintiff reported she cried "all the time." Plaintiff had no suicidal or homicidal thoughts. She wanted to "be happy and move on." N.P. Smith noted Plaintiff had been a patient at the crisis stabilization unit at Northwood in the past and a past patient at Hillcrest five years earlier; she was committed to Hillcrest by her children due to her excessive drinking (R. 416).

N.P. Smith found Plaintiff was alert and oriented. She was pleasant and cooperative. Her eye contact was normal; she was dressed neatly; her speech was normal; she had no delusional behavior. N.P. Smith diagnosed major depressive disorder, moderate and recurrent, and PTSD.

Plaintiff stated she medicated with Prozac and Abilify and that those medications "help[ed]." N.P. Smith increased Plaintiff's dosage of Prozac and Abilify and renewed Plaintiff's prescription for Vistaril (R. 416-17).

Nurse Practitioner Smith completed a pharmacological management note of Plaintiff on September 14, 2009. Plaintiff reported "no difficulties." She was sleeping well; her appetite was good; she was not irritable or agitated; she had no "problems" with her medication. She had "some depression." She was not "sleeping all day like she had been." She felt restless and overwhelmed. Plaintiff had no mood swings. She had been "spending time with her daughter" and this "seem[ed] to help." N.P. Smith noted Plaintiff was cooperative. Her appearance, activity level, speech, and affect were normal. She was oriented. She had no hallucinations. Plaintiff was "maintaining baseline." N.P. Smith prescribed Prozac, Vistaril, and Abilify (R. 418).

Plaintiff presented to N.P. Smith for medication management on September 28, 2009. Plaintiff reported "no difficulties." She was sleeping well, had a good appetite, had normal energy level, and had no "problems" with her medication. She was depressed and had "a lot on her mind." She was "very concerned about her place of employment" and had "a lot planned today and [felt] a little rushed to get it done." N.P. Smith noted Plaintiff was cooperative and oriented. Her appearance, activity level, speech, and affect were normal. She had no hallucinations. Plaintiff was "maintaining baseline." N.P. Smith prescribed Prozac, Vistaril, and Abilify (R. 419).

Nurse Practitioner Smith completed a pharmacological management note of Plaintiff on October 12, 2009. Plaintiff reported "no difficulties." She was sleeping well; her appetite was good; she was not irritable or agitated; she had no "problems" with her medication. She felt depressed. She had been "out of Abilify for a few weeks"; she was concerned about her blood sugar level. She

felt "weepy." N.P. Smith noted Plaintiff was cooperative. Her appearance, activity level, speech, and affect were normal. She was oriented. She had no hallucinations. Plaintiff was "maintaining baseline." N.P. Smith prescribed Prozac, Vistaril, and a decreased dosage of Abilify (R. 418).

Plaintiff presented to N.P. Smith on October 9, 2009, for medication management. Plaintiff reported "no difficulties." She was sleeping well; her appetite was good; she was not irritable or agitated; she had no "problems" with her medication. She felt depressed. Plaintiff stated she was "pretty good"; she moved in with her daughter. She had financial problems. She was still grieving the death of her grandson. N.P. Smith noted Plaintiff was cooperative. Her appearance, activity level, speech, and affect were normal. She was oriented. She had no hallucinations. Plaintiff was "maintaining baseline." N.P. Smith prescribed Prozac, Vistaril, and Abilify (R. 421).

It was noted, on Plaintiff's November 20, 2009, treatment plan at Northwood, that her anxiety was moderate but could "fluctuate due to increased agitation of her current stressors of no permanent housing and no income." Plaintiff had recently been prescribed Geodon instead of Abilify and had no side effects to that medication. Plaintiff stated she wanted to resume therapy at Northwood (R. 423). Plaintiff stated her depression was severe due to not having housing or income. Plaintiff cried daily when she thought about her deceased grandson and her lack of housing and income (R. 424). Plaintiff stated she had not attended therapy sessions because she had been trying to obtain housing, obtain a source of income, and she changed therapists (R. 425). Plaintiff was not suicidal (R. 426). She stated her concentration was "very poor." She stated she could not "handle any kind of change." Plaintiff stated she had "periods of panic" (R. 455).

Plaintiff presented to Northwood on February 8, 2010, for pharmacological management. Plaintiff reported she had no difficulties; she slept well; her appetite was good; she was not irritable

or agitated; she had no "problem" with her medications. Plaintiff felt depressed. She stated she was doing "pretty good" and had "spent time over the holidays with her daughter." She did not "start the Geodon for fear of weight gain." She "just wanted to stay on Prozac" and thought that was the only medication she "need[ed] for now." N.P. Smith noted Plaintiff was cooperative, her appearance was unremarkable, her activity level was normal, her speech was normal, her affect was normal, she was oriented, and she denied hallucinations. N.P. Smith found Plaintiff was "maintaining baseline." Plaintiff was instructed to continue medicating with Prozac (R. 457).

On April 30, 2010, Plaintiff presented to Northwood for pharmacological management. P.A. Sempirek found Plaintiff had no acute symptoms. Plaintiff stated she had no difficulty sleeping; had no symptoms of mania; felt anxious; had been dwelling on the loss of her grandson; had lost interest in doing things; did not want to "go anywhere"; and felt more anxious when she had to "leave outside her secure zone." Plaintiff wanted to begin taking Vistaril again. P.A. Sempirek found Plaintiff was cooperative. Her appearance and psychomotor activity were normal. She had no psychosis. She was oriented. She was "tearful at times." P.A. Sempirek found Plaintiff was functional and "having situational difficulties." She was prescribed Prozac and Vistaril (R. 458).

Plaintiff presented to Northwood on May 8, 2010, for pharmacological management. Plaintiff reported she slept well; her appetite was good; she had no mania; she had no "problems" with her medications. Plaintiff was using a pill organizer to help her be compliant with taking her medication. Her "stressors" were "high"; her mother was in the hospital and her daughter was in a shelter. Plaintiff reported minimum periods of depression and intermittent periods of anxiety. Upon examination, P.A. Sempirek noted Plaintiff was cooperative, her appearance was unremarkable, her activity level was normal, her speech was normal, her affect was normal, she was oriented, and she

had no psychosis. P.A. Sempirek found Plaintiff was functional and having "situational difficulties." He prescribed Vistaril and Prozac (R. 459).

On July 9, 2010, Plaintiff presented to Northwood for pharmacological management. Physician Assistant Sempirek found Plaintiff had no acute symptoms. Plaintiff stated she had no difficulty sleeping; she had no symptoms of mania; her appetite was good; she was not isolating; she had no features of severe depression. She "tended" to sleep a lot. She attended her grandchildren's baseball games. Plaintiff reported multiple health problems that [led] to the sedentary lifestyle." Plaintiff stated she medicated with Vistaril "some." P.A. Sempirek found Plaintiff was cooperative. Her appearance was normal; her psychomotor activity was slowed. Her speech was normal; her affect was appropriate. She was oriented. She had no psychosis. P.A. Sempirek found Plaintiff was "maintaining baseline"; he prescribed Prozac and Vistaril (R. 460).

Plaintiff reported to P.A. Sempirek, at Northwood, on August 6, 2010, that she had no difficulty sleeping, her appetite was good, she had no mania, she felt depressed, she had no "problems" with her medication, she had no physical complaints, she was not isolating herself, and she was not depressed. Plaintiff stated she had been babysitting her grandchildren. She was not getting overwhelmed. She medicated with Vistaril daily. Plaintiff stated that "thoughts of the past" caused her to medicate with Vistaril. P.A. Sempirek noted Plaintiff had not continued with her therapy and did not want to restart it. She wanted medication because that "benefit[ed] her." Plaintiff had no flashbacks or vivid dreaming. P.A. Sempirek found Plaintiff was cooperative, her appearance was unremarkable, her speech was brief, her affect was blunted, she was oriented, and she had no psychosis. P.A. Sempirek found Plaintiff had "underlying depression features, partial response to the medications, [and] would most likely do better if she included therapy." P.A.

Sempirek prescribed Prozac and Vistaril (R. 461).

Plaintiff presented to P. A. Sempirek, at Northwood, on September 7, 2010, with no "signs or symptoms of mania." She felt depressed. She had not been leaving the house. Her grandchildren were in school and she "[found] herself bored." She slept most of the day. Plaintiff stated she realized she needed "to do more in her life." Plaintiff stated that, in the past, when she would leave the house, she "gravitated toward[] alcohol and drug use." She was dwelling on the death of her grandson. Plaintiff wanted to "hold" on P.A. Sempirek's suggestion that her dosage of Prozac be increased; Plaintiff was reluctant to engage in therapy. P.A. Sempirek found Plaintiff was cooperative; her motor activity was slowed; her speech was normal; her affect was blunted; she was oriented; and she had no psychosis. P.A. Sempriek instructed Plaintiff to continue taking her prescription medications; he prescribed Prozac and Vistaril (R. 462).

Plaintiff presented to N.P. Smith on October 1, 2010, for pharmacological management. Plaintiff reported she was sleeping well and her appetite was good. She felt depressed because she could not "get over grief of losing grandson." She had no energy, motivation, or interest. Plaintiff reported she slept excessively. She was not suicidal. N.P. Smith found Plaintiff was cooperative, her appearance was unremarkable, her activity level and speech were normal, her affect was blunted, she was oriented, she had no hallucinations. N.P. Smith assessed grief and depression. She prescribed Prozac, Vistaril, and Deplin (R. 463).

Plaintiff reported to a medical professional at Northwood on October 19, 2010, that she was living with her son; she felt better; she had no side effects of her medication (R. 466). It was noted Plaintiff took "good care of her home" when she felt "up to it." She reported poor concentration and poor social skills. She could not "handle any kind of change." She stated she continued to have

depression and anxiety; she continued to have grief over the death of her grandson.  She stated she did not want to "try therapy again as it will not bring her grandson back."  She had racing thoughts and frequently cried.  She had not been "isolating as much during the summer" but was isolating again now that her grandchildren were in school.  She feared going out in the community.  She had no suicidal or homicidal ideations; she had no hallucinations.   Professional therapy was recommended, but Plaintiff "refused" (R. 468).

Plaintiff presented to N.P. Smith at Northwood on October 29, 2010, for pharmacological management.  Plaintiff stated she was sleeping well. She felt depressed and anxious.  She had no "problems" with her medication.  Plaintiff stated she was "ready to change antidepressants" because she had not "seen any improvement in depression."  Plaintiff stated she was sleeping too much and isolating.  Plaintiff stated she "often wonder[ed] why God let her live and took her . . . grandson instead."  N.P. Smith noted Plaintiff was cooperative; her speech and activity levels were normal; her affect was blunted; she was oriented; and she had no psychosis.  N.P. Smith assessed depression; she prescribed Prozac, Vistaril, Deplin, and Lexapro (R. 470).

In connection with her Social Security application, Plaintiff filed a Function Report – Adult on November 4, 2010.  Plaintiff wrote that her grandson died in 2009, which exacerbated her mental symptoms and affected her physically. She had no energy or strength.  She moved slowly.  She could not "stand to leave the house."  She only wanted to interact with immediate family. She was "very withdrawn" (R. 162).  Plaintiff wrote that she rose, went to the bathroom, brushed her teeth, took medication, did some dishes, did a "little bit" of laundry, ate breakfast, "usually" took a nap, sometimes made dinner, and went to bed early.  Plaintiff wrote that she babysat her grandchildren when they did not have school; she made them lunch.  Plaintiff wrote she had sleep apnea and used

a C-Pap machine at night. She had nightmares about her grandson dying. Plaintiff had "no problem" completing her personal care, which included bathing, dressing, caring for her hair, shaving, feeding herself, and using the bathroom (R. 163). Her daughter-in-law assisted her in keeping her medications 'straight." She used a pill case. She could cook a complete meal; she cooked dinner four (4) or five (5) times per week and did so in a "normal" amount of time. Plaintiff washed dishes and did laundry about four (4) or five (5) days per week and a "little bit" at a time. She took breaks while doing these chores. She lived with her son, daughter-in-law, and her three (3) grandchildren. She had to "force" herself to do anything and did it because her family let her live with them (R. 164). Plaintiff did not go out in public except to "go out on porch to smoke." She did go out in public when "absolutely necessary." Plaintiff rode in a car. She did not shop. She did not "need to" manage money (R. 165). Racing thoughts caused difficulty in her ability to count change; however, she could count it. Watching television was a hobby/interest. Plaintiff had difficulty concentrating. She would spend time with others if they visited her at her son's house. Plaintiff regularly left the house to attend appointments at Northwood; she met once per month with her probation officer. She could not "keep track" of her appointments. She felt safe when she was at home (R. 166). Her ability to walk, hear, complete tasks, concentrate, understand, and get along with others was affected by her symptoms; her memory was affected, too. Her grandson's death had left her "drained." She could walk one-third (1/3) of a mile before she needed to stop. She could not pay attention for long because he mind wandered. She lost track of what she was saying; she jumped from one (1) thought to another (R. 167). She got along "ok" with authority figures. She was fired from her Cabela's job after her grandson died. She did not handle stress or changes in her routine well (R. 168). Plaintiff wrote she had a lot of fear that someone else would die (R. 168-69).

Plaintiff met with N.P. Smith for pharmacological management on November 12, 2010. Plaintiff reported she was sleeping well and felt depressed and anxious. She stated she was worried about her adult children. She slept "too much" during the day. She was sad about her grandson's death. Plaintiff reported she did little socializing. N.P. Smith found Plaintiff was cooperative. Her appearance, speech, and affect were normal. She appeared to be restless. She was oriented and had no psychosis. N.P. Smith found Plaintiff was "at a compensated baseline" and prescribed Lexapro, Deplin, and Trazodone (R. 495).

Plaintiff presented to N.P. Smith for medication management on December 3, 2010. N.P. Smith noted Plaintiff was "having difficulty" and was depressed. Plaintiff reported she had difficulty falling and staying asleep. Her energy level was normal. She felt depressed and anxious. She was tearful because it was the holidays and her grandson had died. She had nightmares. She slept during the day. She had not been "managing her diabetes or taking care of her health." Plaintiff stated Trazadone "help[ed]" her anxiety. N.P. Smith found Plaintiff was cooperative. Her speech, activity, and appearance were normal. Plaintiff was oriented and had no psychosis. N.P. Smith prescribed Lexapro, Periactin, Deplin, and Trazodone (R. 496).

Plaintiff presented to N.P. Smith for medication management on December 17, 2010. N.P. Smith found Plaintiff was "making progress." Plaintiff reported she was sleeping well, her energy level was normal, she was not irritable or agitated, she had no signs of mania, she felt depressed. Plaintiff was motivated and was "going out some." She was "doing more around the house." She felt "like meds starting to work." Her anxiety was "high" but manageable. She was more interactive with her grandchildren. She had been playing games and laughing with her family. She had fewer nightmares. N.P. Smith found Plaintiff's appearance, activity level, and speech were normal. She

was cooperative. She was in "good spirits." She was oriented and had no psychosis. N.P. Smith prescribed Lexapro, Periactin, Deplin, and increased Plaintiff's dosage of Trazadone (R. 497).

On January 3, 2011, Barbara Rush, Ph.D. conducted a "Consultative Evaluation Report Adult Mental Status Examination" of Plaintiff. Plaintiff stated she was the third of ten (10) children and "raised in a good home with a lot of church involvement" (R. 471). Plaintiff spoke regularly to her mother. She was divorced and lived with a son and his family. Plaintiff stated it was a "good situation for all." Plaintiff's chief complaints were she did not "feel like [she could] be around people since [her] grandson died" and "she just [could not] function." Plaintiff stated she was with her grandson when he died. Plaintiff reported she had nightmares about her grandson's death and about other family members being harmed. Her dreams were less vivid "since she [began taking] . . . a new medication." She became "very anxious and uncomfortable" when she was around other people. She cried a lot, she did not enjoy anything, she felt "numb and distant from people," she woke throughout the night, she had gained up to forty (40) pounds, she was distracted when she was around her family, she could see her grandson when she closed her eyes, she had difficulty concentrating, and her memory was "affected." Plaintiff stated she had been feeling "somewhat better" and was "most comfortable when she [was] at home with her children's family" (R. 472).

Dr. Rush reviewed N.P. Smith's psychiatric evaluation in which major depression, recurrent and severe, and PTSD were diagnosed. Dr. Rush noted Plaintiff had been a patient for three (3) weeks at Northwood during the "spring after her grandson died" (R. 472). Plaintiff stated she had been hospitalized for a week a year earlier and she "thought" that hospitalization was "mostly due to adjusting the medication." Plaintiff reported past use of alcohol and drugs. She could not return to her job at Cabela's after the death of her grandson because she "started crying and just could not

29

cope with all the people and the memories that were haunting her" (R. 473).

Upon examination, Dr. Rush found Plaintiff's appearance was adequate. She was tense and "seemed fearful and constricted but cooperative." Her eye contact was good and speech was clear. She was oriented, times three (3). Her mood was anxious and depressed. Her affect was noted as "she cried on and off throughout the session, (sic) she appeared frightened." Plaintiff's psychomotor behaviors showed her rocking in an effort to "calm herself down." As to thought processes, there was "some evidence of blocking." She "seemed to be very distracted by her unresolved grief." Her focus on the loss of her grandson and its "impact on her functioning" affected her thought content. Her judgment was fair, immediate memory normal, recent memory mildly impaired, remote memory mildly impaired, concentration mildly impaired, and pace normal. As to her persistence, Dr. Rush found Plaintiff "appeared very easily upset." As to Plaintiff's social functioning and behavioral observation, Dr. Rush found Plaintiff "arrived on time unaccompanied having driven herself to the exam. She appeared frightened and seemed quite uncomfortable waiting in the reception area with other patients" (R. 474).

Plaintiff's daily activities included the following: rose at 7:00 a.m., helped her grandchildren get ready for school, cleaned "a little," watched television, slept if she slept poorly the night before, did "some of the cooking," and stayed in the house "all day alone." Plaintiff worried and thought constantly when alone. When "the family" came home from school and work, she felt better. She helped prepare dinner and clean afterwards. She went to her room at 7:00 p.m. and attempted to get to sleep by 11:00 p.m. She awoke and rose if she has nightmares. Plaintiff said her "only regular" activities and interests revolved around her children. She attended school and athletic activities that involved her grandchildren, but she "usually [found] a place where she [could] sit by herself" (R.

474).  She had no social life other than with her family (R. 474-75).

Dr. Rush made the following diagnoses: Axis I - PTSD, chronic; Axis II - deferred; Axis III - noninsulin dependent diabetes, sleep apnea, and hypertension as per Plaintiff's report; Axis IV - psychosocial stress levels were moderate; and Axis V - GAF of forty-five (45).  Dr. Rush found Plaintiff's prognosis was guarded because she reported "very little improvement with psychiatric treatment."  Plaintiff could manage her own finances (R. 475).

Plaintiff presented to N.P. Smith on January 7, 2011, for medication management.  N.P. Smith found Plaintiff was anxious and depressed.  Plaintiff reported she had not been sleeping well. She felt as if she had gone "backward."  Every time she left the house, she hyperventilated and rocked.  She had been thinking about her deceased grandson, whose birthday had just passed. Plaintiff stopped medicating with Trazadone, which made her anxiety worse.  N.P. Smith found Plaintiff was cooperative; her appearance, activity level, and speech were normal.  Her affect was "tearful at times."  She was oriented and had no hallucinations.  N.P. Smith prescribed Lexapro, Periactin, Deplin, Trazadone, and Risperdal (R. 498, 595).

It was noted, on January 11, 2011, at Northwood, that Plaintiff had been diagnosed with major depression, recurrent and moderate, and PTSD (R. 499).  Plaintiff had learned coping methods for anxiety when she was in therapy; however, she had "not done them in a long time" (R. 500).  It was noted, in the "Relationship Problems" section, that Plaintiff would "'kill'" her daughter's boyfriend if he hurt her daughter (R. 502).  She reported she rocked back and forth "every time" she left her home and often hyperventilated.  Professional therapy was recommended; Plaintiff refused to participate (R. 504).  Her GAF was thirty-five (35)  (588-93).

On January 13, 2011, Philip E. Comer, Ph.D., completed a Mental Residual Functional

Capacity Assessment of Plaintiff. Dr. Comer found Plaintiff was not significantly limited in any area of understanding and memory. In the sustained concentration and persistence category, Dr. Comer found Plaintiff was not significantly limited in her abilities to carry out very short, simple, or detailed instruction; sustain an ordinary routine without special supervision; and make simple work-related decisions (R. 476). Plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. As to limitations relative to Plaintiff's social interaction, Dr. Comer found Plaintiff was not significantly limited in her abilities to ask simple questions or request assistance, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in her ability to interact appropriately with the general public. As to Plaintiff's adaptability, Dr. Comer found Plaintiff was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others. Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting (R. 477). Dr. Comer found Plaintiff's statements were "reasonably consistent [with] CE and other evidence in file and [were] credible from her perspective. However, she appear[ed] to have the mental/emotional capacity for work like activity in a work environment that has minimal social

interaction requirements" (R. 478).

Dr. Comer completed a Psychiatric Review Technique on Plaintiff on January 13, 2011. He found Plaintiff was positive for affective disorders, anxiety-related disorders, and substance addiction disorders (R. 480). Dr. Comer identified Plaintiff's affective disorders as "history of depression" and her substance addiction disorders as "history of poly subs abuse" (R. 483, 488). He did not list a diagnosis for anxiety-related disorders (R. 485). Dr. Comer found Plaintiff had mild limitations in her activities of daily living; moderate limitations in her ability to maintain social functioning; and mild limitations in maintaining concentration, persistence, and pace. He found Plaintiff had had one (1) or two (2) episodes of decompensation (R. 490).

Plaintiff presented to N.P. Smith for medication management on January 28, 2011. N.P. Smith found Plaintiff was "maintaining baseline." Plaintiff reported she was sleeping well, was not manic, felt depressed, felt irritable, and was depressed and tearful. Plaintiff stated Risperdal helped her be less anxious and sleep better. She stated she had been active and busy "taking care of house." She felt aggressive when she was "out among strangers." N.P. Smith found Plaintiff was cooperative, and her appearance was normal. She "appear[ed] restless. Her speech was normal. She was oriented. She had no psychosis. Her affect was tearful. N.P. Smith prescribed Lexapro, Periactin, and Deplin, and increased Plaintiff's dosage of Risperdal (R. 506, 587).

On February 9, 2011, in conjunction with her filing an application for Social Security Benefits, Plaintiff completed an "Information about Daily Activities" form. Plaintiff wrote that she "sometimes" helped her daughter-in-law feed her grandchildren. Plaintiff reported she had nightmares, she woke during the night, and she worried about her children and grandchildren. Plaintiff had no difficulty accomplishing her personal care; however, she had to make herself care

for herself (R. 183).  Plaintiff wrote that she was sometimes confused about her medication dosages. She could cook meals daily, wash dishes, and do laundry within a normal amount of time.  She needed no help doing these chores (R. 184).  Plaintiff did yard work.  She went outside to smoke. She could only "stand" to be around her children and grandchildren.  Plaintiff could, depending on "how bad" her anxiety symptoms were, go out alone.  She drove.  She did not shop.  Plaintiff could count change.  She had no income, so she did not know if she could pay bills, handle a savings account, or use or a checkbook (R. 185).  Plaintiff had not managed finances since her grandson died on March 11, 2009, when her symptoms "started."  She had no energy or "desire" since the death of her grandson.  Plaintiff watched television.  She panicked if she went outdoors.  Plaintiff played with her grandchildren and spoke to her children on the phone every day.  Plaintiff went to a doctor's appointment every month; she needed reminded to do so and attended appointments alone "most of the time" (R. 186-87).  Plaintiff did not know how far she could walk. She "sometimes . . . jump[ed] from 1 thing to another."  Plaintiff could follow written instructions "ok"; she followed spoken instruction "little by little" (R. 187).  Plaintiff got along "ok" with authority figures. She was  "not good" at handling stress or change.  She had extreme fear of death of a family member.  She wore a C-Pap machine to sleep (R. 188).  Plaintiff stated she felt like she died when her grandson died. When she left the house, she had difficulty breathing, had stomach pains, and her eyes hurt (R. 189).

In N.P. Smith's medication management notes, dated February 18, 2011, she found Plaintiff was cooperative.  Her appearance, activity level, speech, and affect were normal. She was oriented. Plaintiff reported she was having "some" difficulty falling and staying asleep.  Her appetite was good; she had no mania, irritability, or agitation.  She felt anxious but had no "problems" with her medication.  Plaintiff reported she was "doing better."  She had been "calmer" and experienced less

anxiety, rocking, and crying. She stated she normally slept "well." Plaintiff was "excited" about moving out of her family's home and into her own. She "still" had depression. N.P. smith found Plaintiff was making progress and prescribed Lexapro, Periactin, Deplin, and Risperdal (R. 584).

Counselor Kidwell noted, on Plaintiff's February 28, 2011, progress notes at Northwood, that Plaintiff felt "some anxiety" about moving into her own home, but she "[felt] her anxiety [was] improving." Plaintiff stated her "change of medication and optimism . . . assisted in alleviating the symptom some" (R. 585). Counselor Kidwell noted Plaintiff's mood was depressed and her affect and speech were normal. Plaintiff then reported she had "severe depression aeb (sic) poor sleep, poor concentration, and periods of crying." She felt she was a burden to her family. She stated that "getting denied by Social Security" had been "hard for her." Plaintiff reported she had had a "fight with her son" about the use of a cell phone. Plaintiff stated that "most days she has no issues with her son and his family," with whom she lived (R. 586).

Joseph Shaver, Ph.D., completed a Psychiatric Review Technique of Plaintiff on March 15, 2011 (R. 507). Dr. Shaver found Plaintiff's affective disorder was depression (R. 510). Plaintiff's anxiety-related disorder was "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" (R. 512). Dr. Shaver found Plaintiff had mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, and mild limitations in maintaining concentration, persistence, and pace. Plaintiff had experienced two (2) episodes of decompensation (R. 517). Dr. Shaver reviewed Dr. Rush's consultative examination and the January 28, 2011, record from Northwood (R. 519).

Dr. Shaver completed a Mental Residual Functional Capacity Assessment of Plaintiff on March 13, 2011. He found Plaintiff was not significantly limited in any ability in the understanding

and memory category (R. 521). In the sustained concentration and persistence category, Dr. Shaver found Plaintiff was not significantly limited in any ability, except she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 521-22). In the social interaction category, Dr. Shaver found Plaintiff was not significantly limited in her ability to interact appropriately with the general public, ability to ask simple questions or request assistance, ability to maintain socially appropriate behavior, and ability to adhere to basic standards of cleanliness and neatness. She was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors or ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In the adaption category, Dr. Shaver found Plaintiff had mild limitations in all abilities, except she was moderately limited in her ability to respond appropriately to changes in the work setting (R. 522). He reviewed Dr. Rush's consultative examination. Dr. Shaver noted Plaintiff could cook, wash dishes, do laundry, and drive, and found she "retain[ed] the mental capacity to operate in work-like situations that do not require large amounts of social interaction or strict production quotas" (R. 523).

Plaintiff met with N.P. Smith for medication management on March 18, 2011. Plaintiff stated she was having difficulty falling and staying asleep. She was not irritable or agitated. She had no mania. She was depressed as it was the second year anniversary of the death of her grandson; however, she was less depressed, anxious, and tearful. She had no "problems" with her medication. Plaintiff reported she was looking forward to moving into her own apartment; she had "stay[ed] busy and active during the day." Plaintiff reported she was more optimistic. N.P. Smith found Plaintiff was cooperative. Her appearance, activity level, speech, and affect were normal. She was oriented.

N.P. Smith found Plaintiff was "making progress" and "maintaining baseline."

Plaintiff presented to N.P. Smith on May 2, 2011, for medication management. She reported she had difficulty falling and staying asleep. Her appetite was good. She felt depressed, anxious, and irritable. Plaintiff stated she experienced increased anxiety when she had to leave the house so she took "twice the amount of Risperdal." She had nightmares about "things happening to people close" to her. N.P. Smith found Plaintiff was cooperative. Her level was normal, she was oriented, her speech was focused and slightly pressured, and she appeared "in good spirits." Plaintiff's affect was irritable and labile. N.P. Smith found "no acute symptoms detected . . . ." She prescribed Lexapro, Periactin, Deplin, Risperdal, and Valporic (R. 581).

Counselor Kidwell, of Northwood, noted, on May 2, 2011, that Plaintiff was making "minimal" progress. Plaintiff stated she did not want to leave her home because she became anxious. Plaintiff had left her home to attend the counseling session "because she had too (sic)." Plaintiff stated that, when she lived alone, she would grocery shop; however, she would not go to Walmart because it brought "back triggers." Plaintiff had participated in a "Walk for Cancer" to honor her grandson; however, she did not like to walk around her block because she did not "like what the people [were] thinking about her" (R. 582).

Plaintiff presented to N.P. Smith on May 23, 2011, for pharmacological management. Plaintiff stated she was sleeping well, had normal energy levels, had no mania, but was depressed and irritable; however, her depression was improving. She stated she was "calmer" but did not want to leave her house. She had not been "shaking or rocking"and had had no crying spells. Plaintiff had no "problems" taking care of herself or home. N.P. Smith found Plaintiff was cooperative and oriented; her activity level, speech, and affect were normal.N.P. Smith found Plaintiff was "making

progress" and prescribed Lexapro, Periactin, Deplin, Risperdal, and Valporic (R. 580, 583).

Plaintiff presented to N.P. Smith for medication management on July 15, 2011. Plaintiff was sleeping well, had no mania, and felt depressed and anxious. She had moved into her own apartment, which was "working out well." She had been trying to "get out"; she took walks. She thought about her deceased grandson. She did not want to participate in therapy. N.P. Smith found Plaintiff was cooperative and oriented. Her activity level, speech, and affect were normal. N.P. Smith diagnosed anxiety and depression and prescribed Periactin, Deplin, and Valporic and increased the dosage of Risperdal and decreased her dosage of Lexapro (R. 569).

A counseling progress note was completed on Plaintiff on July 15, 2011, at Northwood. Plaintiff used coping strategies to treat depression, but she did "not always follow through" (R. 570). Plaintiff's application for Social Security disability benefits was denied. Plaintiff avoided situations that caused her to become anxious, which included going to medical appointments (R. 572). Plaintiff stated that, once her medication had been adjusted last month, she felt "calmer" (R. 577).

Plaintiff met with N.P. Smith on August 10, 2011, for medication management. Plaintiff reported she was sleeping well. Her energy level was normal. She denied irritability or agitation. She had no symptoms of mania. Plaintiff felt anxious. She had a better relationship with her mother. Plaintiff lived alone; she felt "refreshed and motivated in" the morning. She was attending a family outing over the weekend. She could tolerate her family. N.P. Smith found Plaintiff was cooperative. Her activity level, speech, and affect were normal. She was oriented. N.P. Smith found Plaintiff was "making progress." She prescribed Lexapro, Periactin, Deplin, Risperdal, and Valporic (R. 568). Plaintiff presented to N.P. Smith on September 7, 2011, for medication management. Plaintiff reported she was sleeping well, her energy level was normal, she felt

depressed and irritable.  She had no "problems" with medications.  She reported her daughter and grandchildren were living with her.  She had been thinking about her deceased grandson.  Plaintiff stated she thought she would feel better when her family moved out. N.P. Smith found Plaintiff was cooperative.  Her appearance was unremarkable.  Her activity level, speech, and affect were normal.  She was oriented.  She had no psychosis.  N.P. Smith found Plaintiff was having "situational difficulties."  She prescribed Lexapro, Periactin, Deplin, Risperdal, and Valporic (R. 567).

An individual treatment plan was developed for Plaintiff at Northwood on September 16, 2011.  Her diagnoses were major depression, recurrent and moderate, and PTSD (R. 557).  It was noted Plaintiff had increased nervousness during the past month because her daughter and her daughter's three (3) children were staying with her "illegally while they get their HUD placing her at risk of her own" (R. 558).  Plaintiff felt safer at home than she did at the store.  She would not make eye contact with those whom she encountered so she would not have to talk to them and could "go about her day."  Plaintiff had begun walking when she moved to her apartment; she stopped doing that.  She rarely exercised with the stationary bike her mother had given her.  Plaintiff stated she had been anxious when she attended family functions.  She said she had been "getting anxious" because her house was in "disarray" because her daughter and her daughter's children lived with her.  Plaintiff stated that cleaning was a coping tool for her; however, she did not "pick up" after the daughter and her daughter's children because she thought they should do it themselves (R. 559).  Plaintiff stated she wanted to sleep more, and her concentration continued to be "poor."   Plaintiff reported her depression had been "'mild'" for the past six (6) months (R. 560).  Plaintiff slept as a coping tool.  Plaintiff reported she had been spending time every day with a neighbor; however, the neighbor had been admitted to the hospital, and Plaintiff's "decline started" (R. 561).  Plaintiff

reported she had "resolve[d] issues" with her mother; however, she was easily "upset" because her daughter and her daughter's children were living with her, which caused her "grief." She was "upset" with her daughter's "ex," who entered her home without knocking (R. 562). She had been isolating in her room because of the "conflict" in her home. This caused her to be depressed and anxious (R. 563). Plaintiff had done "better" when she lived alone. Before her daughter and her daughter's family moved in with her, Plaintiff would wake up "refreshed" (R. 565).

Plaintiff reported to N.P. Smith on October 14, 2011, for medication management. She reported she had been sleeping well, felt depressed, felt anxious, and felt irritable. Plaintiff reported she had been "getting depressed again for no known reason." She had been "dwelling on grandson's death again." She preferred to sleep and stay home. She was able to cook, clean, and care for herself, but she had to "force" herself to accomplish those chores. She worried that something would happen to her children and grandchildren. She did not feel helpless or hopeless. She felt "overwhelmed" because her daughter and her daughter's three (3) children were staying with her. N.P. Smith found Plaintiff was cooperative. Her activity level was normal. Her speech was soft. Her affect was flat. She was oriented. She had no psychosis. N.P. Smith diagnosed depression. N.P. Smith decreased Plaintiff's dosage of Lexapro to discontinue it. She prescribed Periactin, Deplin, Risperdal, and Valporic (R. 556).

Plaintiff engaged in medication management on October 28, 2011, with N.P. Smith at Northwood. Plaintiff reported difficulty sleeping and feeling anxious and irritable. Plaintiff had no "problems" with her medication. Plaintiff stated she was doing well; however, her anxiety had been "really high" due to her daughter and her daughter's family living with her. Plaintiff had mood swings, racing thoughts, and difficulty focusing and concentrating. She had "been dwelling on

deceased grandson again." N.P. Smith found Plaintiff was cooperative. She appeared restless, her speech was normal, her affect was blunted, and she was oriented. N.P. Smith found Plaintiff was having "situational difficulties" and "mood instability." N.P. Smith increased Plaintiff's dosages of Viibryd and Depakote; she prescribed Periactin, Deplin, and Risperdal (R. 555).

Plaintiff met with N.P. Smith on November 11, 2011, for medication management. Plaintiff stated she was not sleeping well. She had no manic symptoms. Plaintiff felt depressed, anxious, and irritable. She had racing thoughts. Plaintiff stated her symptoms were worse with "new med," and her symptoms were "more intense" because of the upcoming holidays. Plaintiff stated her family was staying with her, which increased her stress. N.P. Smith found Plaintiff was cooperative, her appearance was unremarkable, she was restless, her speech was normal, her affect was blunted, she had no psychosis, and she was oriented. N.P. Smith diagnosed "medication reaction." She was instructed to "taper and [discontinue] Risperdal." N.P. Smith prescribed Depakote, Periactin, Deplin, Viibryd, and Lexapro (R. 554).

Plaintiff presented to Dr. Corder, at Northwood, for a medication management appointment on November 29, 2011. Plaintiff stated she was having difficulty falling and staying asleep. She was depressed and anxious. She felt "worse off Risperdal." She remained in bed, experiencing racing thoughts about her grandson's death. She was nervous. She rocked "all the time, all day long." Dr. Corder found Plaintiff was cooperative. She had slowed motor activity, brief and focused speech, and restricted affect. Dr. Corder assessed "intrusive deprsessive (sic) thoughts and recollections." He prescribed Depakote, Lexapro, Deplin, Remeron, and Periactin (R. 637).

A Medical Necessity Assessment was completed on Plaintiff on December 12, 2011, at Northwood by a clinician. Plaintiff stated she wanted to be alone, felt tired and depressed, was easily

distracted, and had no energy. Plaintiff was rocking back and forth in her chair. It was noted that Plaintiff had been "seen for drug and alcohol counseling while incarcerated," had been placed in Hillcrest, had been treated at Health Right, and sought treatment at Northwood when her grandson died in March, 2009 (R. 625). Plaintiff had no difficulty with her medications (R. 626). Plaintiff was oriented; her speech, appearance, and thought content were normal. Her affect was appropriate. She had deficient coping skills, moderate inattention, and withdrawn sociability (R. 627). Plaintiff reported severe depression and anxiety (R. 629). Plaintiff's five (5) year probationary period ended in August 2011 (R. 632). It was noted Plaintiff had moderate difficulties in maintaining self care; activities of community living; and social, interpersonal, and family functioning. Plaintiff had marked limitations in concentration and task performance. Plaintiff had no difficulties with maladaptive, dangerous or impulsive behaviors (R. 633). Plaintiff was diagnosed with major depression, recurrent and moderate, and PTSD. Her psychosocial stressors were listed as "mild." Her GAF was thirty-five (35) (R. 634). Medication management, targeted case management, and professional therapy were recommended. Plaintiff refused to participate in professional therapy (R. 635).

Plaintiff presented to N.P. Smith on January 2, 2012, for medication management. N.P. Smith found Plaintiff was "making progress." She noted Plaintiff was cooperative; her activity level and speech were normal. Her affect was blunted. She was oriented. Plaintiff reported she was sleeping well, her energy level was normal, she was not irritable or agitated, she had no mania, she felt depressed, she had no "problems" with medications, and she had been eating less. Plaintiff stated she felt "better." She had no noticeable mood swings. She was "still dealing" with grief and depression. She lived alone and found that "less stressful." N.P. Smith prescribed Depakote,

Lexapro, and Deplin. N.P. Smith did not refill Plaintiff's prescription for Remeron because Plaintiff "never filled" the earlier prescription (R. 624).

Plaintiff presented to Doctors Urgent Care on January 7, 2012, and was treated for anxiety by Dr. Midcap (R. 605). Plaintiff reported she was nervous; she denied any symptoms of depression, memory loss, or confusion (R. 606). Dr. Midcap prescribed Xanax (R. 607).

Plaintiff presented to N.P. Smith on January 30, 2012, for medication management. Plaintiff stated she was sleeping well and was not irritable, agitated, or manic. She felt depressed and anxious. She had no "problems" with her medications and felt "better" with Depakote and Remeron. Plaintiff's blood sugar and appetite were normal. Plaintiff was concerned that "'social phobia'" needed to be listed as a diagnosis because she was "focused on SSI hearing . . . ." Plaintiff stayed home, watched television, did housework, and talked on the phone with family members. When she went "to the store she [got] shaky (sic)" because she did not want to be around other people. She continued to think about her deceased grandson. N.P. Smith found Plaintiff was cooperative, and her activity level and speech were normal. Her affect was blunted. She was oriented. N.P. Smith found Plaintiff was "maintaining baseline" and prescribed Lexapro and Deplin (R. 623).

On February 24, 2012, Dr. Midcap, of Doctors Urgent Care, completed a Questionnaire as to Mental Residual Functional Capacity. In the social interaction category, Dr. Midcap found Plaintiff had marked limitations in her ability to accept instructions from or respond appropriately to criticism from supervisors or superiors and ability to respond appropriately to co-workers or peers (R. 638). Dr. Midcap found Plaintiff had extreme limitations in her ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes and ability to relate to general public and maintain socially appropriate behavior (R. 638-39). He found Plaintiff

was "unable to work at all." In the sustained concentration and persistence category, Dr. Midcap found Plaintiff had marked limitations in her abilities to perform and complete work tasks in a normal work day or week at a consistent pace, work in cooperation with or in proximity to others without being distracted by them, process subjective information accurately, use appropriate judgment, carry through instructions, complete tasks independently, and perform at production levels expected by most employers. He found Plaintiff had extreme limitations in her ability to maintain attention and concentration for more than brief periods of time (R. 639). As to Plaintiff's adaptation, Dr. Midcap found Plaintiff had moderate limitations in her ability to maintain personal appearance and hygiene; marked limitations in her ability to respond appropriately to changes in the work setting, ability to remember locations and workday procedures and instructions, and ability to be aware of normal hazards and take necessary precautions; and extreme limitations in Plaintiff's ability to behave predictably, reliably, and in an emotional stable manner and ability to tolerate customary work pressures. Dr. Midcap found Plaintiff's conditions would deteriorate if Plaintiff was "placed under stress" at her job in that anxiety and depression would increase. Dr. Midcap found Plaintiff could manage her own finances (R. 640). Dr. Midcap found Plaintiff's impairments lasted or were expected to last for twelve (12) months or more (R. 641).

Administrative Hearing

Plaintiff testified at the March 9, 2012, administrative hearing that she lived alone (R. 39). Plaintiff had a Medicaid card (R. 41). Plaintiff testified she was unemployed, had not worked since the death of her grandson, and had not attempted to become employed (R. 42-43). Plaintiff stated she had experienced "mental problems" since the death of her grandson. She could "not sit still." She had anxiety "real bad." She did not leave the house except for doctors' appointments or to

attend "something like this." She could not be "around large groups of people." Plaintiff stated if she were "out and about too long," she would "get knots" in her stomach (R. 53). Anxiety caused her heart race to race and her to stomach hurt. Plaintiff stated she did not know how far she could walk because she "never" left her home (R. 54). Plaintiff stated that, "once in a while," one of her children or her mother would "stop" at her home and "check" on her. She belonged to no church, club, or organization (R. 59). Plaintiff watched television, could care for her personal hygiene, could drive, wash dishes, and vacuum (R. 60-61). Her children took groceries to her. Plaintiff was transported to the administrative hearing by her aunt (R. 61).

Plaintiff testified she woke, took medication, checked her blood sugar, ate breakfast, used exercise machines "since [she had] this phobia of going out around people,"drank coffee, watched television, and occasionally sat on her porch steps (R. 62-63). When questioned by her lawyer, Plaintiff stated that she could not have conversations with people unless she has to go to a doctor's appointment. Plaintiff was "real stressed" about attending the administrative hearing. Plaintiff stated she did not "quit" rocking back and forth and had done so since the death of her grandson (R. 64). Plaintiff stated she was afraid to drive and had driven alone four (4) months earlier (R. 65). Plaintiff testified she was treated for anxiety and other mental health issues by Dr. Midcap, who prescribed Xanax, and Northwood (R. 66). Plaintiff testified she had been admitted to Northwood twice. The first occasion was due to her having a "nervous breakdown" when her grandson died. She was then admitted later in 2009. Plaintiff testified she "talk[ed]" to her doctor at Northwood, which was "helping" her (R. 67). Claimant left the hearing prior to the VE's testimony (R. 69).

The ALJ asked the VE the following hypothetical question:

I'd like you, if you would please[,] to consider an individual who's capable of

performing work at all exertional levels. In addition to that, they're not able to do any production rate or pace work. There (sic) work is limited to simple, routine, and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes. They can have no interaction with the public and only occasional interaction with coworkers in the – occasional interaction with coworkers and no tandem tasks. Could this individual perform the claimant's past work? (R. 70-71).

The VE responded that such a person could do the job of hand packager (R. 71).

The ALJ asked if there was other work available in the regional or national economy that such an individual could perform. The VE testified that such an individual could perform the work of kitchen helper, commercial cleaner, and cleaner (R. 71).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Cusick made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since March 11, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: major depressive disorder; bipolar disorder; anxiety; . . . []PTSD[]; and remote history of polysubstance and alcohol abuse (20 CFR 404.1520(c)) (R. 18).

4.  The claimant dos not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work should involve no production rate or pace work; work is limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions with few, if any, work place changes; and work should entail no interaction with the public and no more than occasional contact with

coworkers with no tandem tasks (R. 19).

6.    The claimant is capable of performing past relevant work as a hand packager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565) (R. 24).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 11, 2009, through the date of this decision (20 CFR 404.1520(f) (R. 26).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.     The ALJ erred in failing to give great weight to the Plaintiff's treating physicians (Plaintiff's Brief at 4-6)

2.     The ALJ erred in giving great weight to a non-examining, non-treating source (Plaintiff's Brief at 6-8).

The Commissioner contends:

1.     The ALJ properly assigned little weight to Plaintiff's low GAF scores (Defendant's Brief at 10-13).

2.     The ALJ reasonably assigned great weight to the opinion of the reviewing state agency mental health experts (Defendant's Brief at 13-15).

## C.  GAF Scores and Treating Physicians

As her first argument for relief, Plaintiff asserts that the "ALJ failed to mention or give any weight to [her] treating physicians at Northwood Health Systems in his decision."  (Plaintiff's Brief at 3.)  Specifically, Plaintiff argues that the GAF scores assigned to her by her treating physicians "indicate serious to major impairment in social and occupational functioning."  (Id. at 5.)  Defendant asserts that the ALJ properly assigned little weight to Plaintiff's low GAF scores.  (Defendant's Brief at 10-13.)

With respect to Plaintiff's GAF scores, the ALJ wrote:

In terms of the claimant's alleged mental impairments, the record reflects that she experienced an acute exacerbation of symptoms in April 2009, when she was admitted to the crisis stabilization unit ("CSU") at Northwood Health Systems.  She was diagnosed with major depressive disorder, recurrent, moderate; PTSD; and polysubstance dependence.  She was assigned a Global Assessment of Functioning

("GAF") score of 25, which indicates that she was laboring under delusional behavior. Exhibit 1F. The claimant had another acute exacerbation of symptoms in August 2009, as she was admitted into the CSU again. She was assessed a GAF of 25, and she exhibited marked difficulty in concentration and task performance. Yet, her social, interpersonal, and family functioning were only moderately deficient. Exhibit 4F. This tends to undermine her GAF score of 25.

These CSU admissions suggest the presence of serious symptoms during those brief exacerbations of symptoms. However, the claimant's symptoms did not persist for 12 consecutive months at that level of severity. During subsequent outpatient treatment in September 2009, the claimant's symptoms appeared improved:

> Carol appears today for the scheduled appointment. The patient described having no difficulties. Patient is sleeping well. Appetite is good. Denies irritability or agitation. Reports feeling depressed. Denies any problems with medications. Still having some depression, not sleeping all day like she had been, feels restless, overwhelmed, reports no agitation, less mood swings. Has been spending time with her daughter and this seems to help. The patient is cooperative. Appearance is unremarkable. Activity level is normal. Speech is normal. Affect is normal. Oriented to person, place and time. Denies hallucinations. As a result of my assessment the patient has no indications of being at an increased risk for danger to self or others.

Thus, the claimant's baseline level of functioning is far better than those acute exacerbations of symptoms in April and August 2009. In October and November 2009, she was maintaining her baseline status, and her presentation was similar to what it was in September 2009. However, despite normal findings in November 2009, the claimant's treating source assigned the claimant a GAF of 35, which indicates some impairment in reality. Exhibit 5F. This finding appears far out of proportion with the claimant's presentation at that time. Indeed, the GAF scores in the record are highly questionable given the fact that she was assigned scores of 35 when she was maintaining her baseline functioning. Further, regarding GAF scores in general, the Administrative Law Judge accords them relatively little weight or reliability in determining a claimant's mental status or functioning over any period of twelve or more continuous months. These scores are essentially based completely on the claimant's subjective complaints and other statements at that particular point in time. This body of often uncorroborated subjective statements is then subjectively processed through the evaluator's own individual mindset and interpretations regarding mental impairments, symptoms, severity and other factors. The undersigned believes that such a process can well lead to inaccuracies and inconsistencies. Thus, these scores are accorded only limited weight.

(R. at 20-21.)

The fourth edition of the <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>")

states:

> In most situations, the clinical diagnosis of a DSM-IV mental disorder is not
> sufficient to establish the existence for legal purposes of a "mental disorder," "mental
> disability," "mental disease," or "mental defect." In determining whether an
> individual meets a specified legal standard . . ., additional information is usually
> required beyond that contained in the DSM-IV diagnosis. . . . It is precisely because
> impairments, abilities, and disabilities vary widely within each diagnostic category
> that assignment of a particular diagnosis does not imply a specific level of
> impairment and disability.

American Psychiatric Ass'n, <u>DSM-IV</u>, xxxii-xxxiii (4th ed., text rev. 2000). "A GAF score may

reflect the severity of a patient's functioning or her impairment in functioning **at the time** the GAF

score is given. Without additional context a GAF score is not meaningful." <u>Green v. Astrue</u>, C/A

No. 1:10-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) (emphasis added); <u>see also</u>

American Psychiatric Ass'n, <u>DSM-IV</u> 33 (indicating that unless otherwise noted, the GAF score

generally refers to the level of functioning at the time of evaluation). Nevertheless, GAF scores are

considered to be and are evaluated similarly to objective medical evidence. <u>Hoelck v. Astrue</u>, 261

F. App'x 683, 685-86 (5th Cir. 2008) (explaining that the ALJ did consider the lowest GAF score

because he mentioned the hospital visit when the low score was assigned, suggesting that the ALJ

concluded that the GAF score was to be given little weight); <u>see also</u> <u>Hawks v. Astrue</u>, No. 5:08-

00837, 2009 WL 3245267, at *10 (S.D. W. Va. Sept. 30, 2009) (noting that the "ALJ properly noted

the inconsistencies between Dr. Ide's assessed marked limitations and the GAF scores of 55,

indicating only moderate symptoms or difficulty in functioning").

A GAF score "may have little or no bearing on . . . social and occupational functioning."

<u>Kornecky v. Comm'r of Soc. Sec.</u>, 167 F. App'x 496, 511 (6th Cir. 2006); <u>see also</u> <u>Lopez v.</u>

Barnhart, 78 F. App'x 675, 678 (10th Cir. 2003); Wilkins v. Barnhart, 69 F. App'x 775, 780 (7th Cir. 2003).  Essentially, "a GAF score, without evidence that it impaired [the] ability to work, does not establish an impairment."  Camp v. Barnhart, 103 F. App'x 352, 354 (10th Cir. 2004) (alteration in original); see also Ward v. Astrue, No. 3:00-CV-1137-J-HTS, 2008 WL 1994978, at *3 (M.D. Fla. May 8, 2008) ("[A]n opinion concerning GAF, even if required to be accepted as valid, would not translate into a specific finding in regard to functional limitations.").  "[T]he Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)).

The ALJ correctly noted that GAF scores only reflected Plaintiff's functioning at a particular moment in time.  See Brown v. Astrue, No. 7:08cv003, 2008 WL 5455719, at *6 n.6 (W.D. Va. Dec. 31, 2008) ("A GAF score is a snapshot of a person's functioning at a particular point in time, and is not a longitudinal indicator of the person's functioning.").  Furthermore, at no time did any of the providers who assigned the low GAF scores suggest that Plaintiff had mental limitations precluding her ability to work.  (See R. at 208, 222, 267, 271, 273, 275, 277, 279, 281, 284, 348, 360, 368, 388, 390, 392, 411, 417, 422, 464, 499, 557, 571, 588, 634.); see also Camp, 103 F. App'x at 354; Ward, 2008 WL 1994978, at *3.

The ALJ also correctly noted that Plaintiff's GAF scores were inconsistent with findings that she was maintaining baseline functioning.  For example, on April 23, 2009, Plaintiff told a mental health professional at Northwood that her medication was "helping," that she was socializing more,

and that her concentration was improving. (R. at 281.) Plaintiff had no hallucinations or delusions, and her appearance and speech were normal. (Id. at 343.) The professional noted that Plaintiff was improving and making relevant progress toward crisis resolution. (Id. at 282, 344.) Despite these findings, however, the provider assigned Plaintiff a GAF of 25, which indicates: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). DSM-IV at 32.

On May 12, 2009, Plaintiff informed a mental health provider at Northwood that her medications were "really working" and that her depression had decreased. (R. at 267.) She felt more positive, had increased concentration, and desired to spend time with her grandchildren. (Id.) Despite these findings, however, the mental health provider assigned her a GAF of 35. (Id.) A GAF of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.). DSM-IV at 32.

On November 9, 2009, Plaintiff saw N.P. Smith for medication management. (R. at 421.) She reported "no difficulties" and stated that she was not irritable or agitated. (Id.) Plaintiff had moved in with her daughter. (Id.) N.P. Smith noted that Plaintiff had no hallucinations and had normal speech, appearance, and affect. (Id.) She determined that Plaintiff was "maintaining baseline." (Id.) Despite these findings, Plaintiff was assigned a GAF of 35 eleven days later on

November 20, 2009, when an individualized treatment plan was created at Northwood.  (Id. at 422.)

Although Plaintiff has provided several pin cites to the records detailing her treatment at Northwood, she has no where identified which source is a "treating source" that should have been given more weight by the ALJ.  See Gorayeb v. Astrue, No. 2:11-cv-36, 2011 WL 7431717, at *9 (N.D. W. Va. Oct. 24, 2011) (Seibert, Mag. J.) (rejecting the plaintiff's argument that the ALJ erred by not assigning weight to the opinions of her treating sources at Northwood because she failed to identify which sources should have been given more weight), aff'd by Gorayeb v. Astrue, 845 F. Supp. 2d 753 (N.D. W. Va. 2011).  In any event, the ALJ specifically stated that his "residual functional capacity assessment is supported by [Plaintiff's] treatment records (but not the GAF scores from these records)."  (R. at 24.)  For example, the ALJ noted that in November 2010, Plaintiff was doing "very little [] socializing."  (Id. at 21, 495.)  By limiting her to work "entail[ing] no interaction with the public and no more than occasional contact with coworkers with no tandem tasks," (Id. at 19), the ALJ incorporated those findings from Northwood into his determination of Plaintiff's RFC.

In sum, the ALJ properly assigned little weight to GAF scores assigned to Plaintiff by her providers at Northwood Health Systems.  He correctly noted that GAF scores only reflected Plaintiff's functioning at a particular point in time, and none of the providers who assigned the low GAF scores ever suggested that Plaintiff's mental limitations precluded her ability to work. Furthermore, as discussed above, several of the GAF scores were internally inconsistent with Plaintiff's treatment records at Northwood.  Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision.

### D. State Agency Physicians

As her second assignment of error, Plaintiff claims that the ALJ erred in assigning great weight to Dr. Comer, a State agency consultant. (Plaintiff's Brief at 5.) Specifically, Plaintiff alleges that the ALJ should have assigned greater weight to the consultative examination performed by Dr. Rush than that assigned to the State agency consultants. (Id. at 5-7.) Defendant asserts that the ALJ reasonably assigned greater weight to the opinions provided by the State agency consultants than the examination performed by Dr. Rush. (Defendant's Brief at 13-15.)

As to medical opinions, 20 C.F.R. § 404.1527 states:

(c) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

54

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or

contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Furthermore, 20 C.F.R. § 404.1527(f)(2)(I) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Social Security Ruling ("SSR") 96-6p also provides guidance for evaluating State agency opinions:

Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

. . .

For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State

evidence in file and are credible from her perspective however, she appears to have the mental/emotional capacity for work like activity in a work environment that has minimal social interaction requirements.

Exhibit 9F. Dr. Comer's opinion is buttressed by the subsequent opinion of Dr. Joseph Shaver, Ph.D., another State agency consultant. Exhibit 14F. The fact that these two experts prepared separate reports and reached similar conclusions lends credibility to each assessment. Drs. Comer and Shaver have accurately depicted the claimant's functional limitations, and the undersigned has incorporated these limitations, to the extent they are consistent with the evidence as a whole, in the above residual functional capacity. Their findings in the psychiatric review techniques are equally as persuasive, and they have been adopted in full. Exhibits 10F and 13F.

(R. at 23.)

As to Dr. Rush's opinion, the ALJ stated:

Some weight is accorded to the opinion of the consultative examiner, Dr. Rush. Exhibit 8F. This source personally examined the claimant, but as explained by Dr. Shaver, some of her results may have been skewed by inadequate effort during the consultative examination:

Refer to PRTF for case details on this 57 y/o female. Clmt is alleging a mental disability on the basis of depression, anxiety and PTSD. MSE (1/3/11) rated recent/remote memory and concentration as only mildly impaired while immediate memory and pace fell WNL. *Clmt tended to give up easily during the Psych CE* and significant problems were reported with regards to social interaction.

Exhibit 14F. Thus, some of the findings assessed by Dr. Rush maybe [sic] skewed. This is particularly true with regard to her GAF score of 45, which appears out of proportion with the claimant's baseline functioning observed during treatment at Northwood Health Systems as well as the claimant's activities of daily living.

(R. at 24.)

Plaintiff takes issue with the fact that Dr. Comer, unlike Dr. Rush, never personally examined her and that his opinion "was tendered on January 2011 and was based only on his review of the exhibits then in the record. . . . The only basis for his decision was [her] medical history and Dr.

Rush's report following a consultative examination." (Plaintiff's Brief at 6.) However, the undersigned notes that Dr. Comer and, likewise, Dr. Shaver, could not have based their opinions on a complete case record. Their opinions were rendered in January and March 2011, and evidence was subsequently submitted covering records that dated well into February 2012.

In his Mental Residual Functional Capacity Assessment of Plaintiff, Dr. Comer found that Plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. As to limitations relative to Plaintiff's social interaction, Dr. Comer found that Plaintiff was moderately limited in her ability to interact appropriately with the general public. (R. at 477.) Dr. Comer found Plaintiff's statements were "reasonably consistent [with] CE and other evidence in file and [were] credible from her perspective. However, she appear[ed] to have the mental/emotional capacity for work like activity in a work environment that has minimal social interaction requirements" (Id. at 478.) In his Psychiatric Review Technique, Dr. Comer noted that Plaintiff had mild limitations in her activities of daily living; moderate limitations in her ability to maintain social functioning; and mild limitations in maintaining concentration, persistence, and pace. (Id. at 490.)

In his Psychiatric Review Technique of Plaintiff, Dr. Shaver found that Plaintiff had mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, and mild limitations in maintaining concentration, persistence, and pace. (R. at 517.) In his Mental Residual Functional Capacity Assessment of Plaintiff, he found that she was moderately limited in

her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 521-22.) In the social interaction category, Dr. Shaver found Plaintiff was not significantly limited in her ability to interact appropriately with the general public, ability to ask simple questions or request assistance, ability to maintain socially appropriate behavior, and ability to adhere to basic standards of cleanliness and neatness. She was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors or ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. at 522.) Dr. Shaver noted Plaintiff could cook, wash dishes, do laundry, and drive, and found she "retain[ed] the mental capacity to operate in work-like situations that do not require large amounts of social interaction or strict production quotas." (R. at 523.)

After her examination, Dr. Rush noted that Plaintiff was tense and "seemed fearful and constructed, but cooperative." (R. at 474.) Plaintiff had an anxious and depressed mood. (Id.) Dr. Rush noted that Plaintiff "tended to rock herself, apparently to calm herself down." (Id.) She exhibited some thought blocking and appeared 'very distracted by her unresolved grief." (Id.) Plaintiff's immediate memory were within normal limits, but Dr. Rush found that her recent memory, remote memory, and concentration were mildly impaired. (Id.) As to Plaintiff's persistence, Dr. Rush found that she "appeared very easily upset." (Id.) Dr. Rush also noted that Plaintiff "appeared frightened and seemed quite uncomfortable waiting in the reception area with other patients." (Id.) She diagnosed Plaintiff with chronic PTSD, moderate psychosocial stress levels, and a GAF of 45. (Id. at 475.)

Plaintiff asserts that evidence in the record, particularly treatment records from Northwood

Health Systems, "document significant, continuing mental health impairment [sic] which were not reviewed by Dr. Comer." (Id.) According to Plaintiff, this evidence "documents significantly more restrictions and more severe limitations than reflected in the residual functional capacity." (Id.) When completing a Psychiatric Review Technique of Plaintiff, Dr. Comer reviewed Plaintiff's treatment records from Northwood Health Systems, which included the following:

- On July 9, 2010,[1] Plaintiff reported to P.A. Sempirek at Northwood that she was not isolating herself and that she had no severe depression. (R. at 460.) P.A. Sempirek found that Plaintiff was cooperative, had an appropriate affect, and was maintaining baseline. (Id.)

- On August 6, 2010, Plaintiff reported to P.A. Sempirek that she felt depressed. (R. at 461.) P.A. Sempirek found that Plaintiff had a blunted affect and a partial response to her medications. (Id.)

- On September 7, 2010, Plaintiff reported to P.A. Sempirek that she had not been leaving her house and that she spent most of the day sleeping. (R. at 462.) P.A. Sempirek found that Plaintiff had a blunted affect and slowed motor activity. He continued her on her medications. (Id.)

- On October 1, 2010, Plaintiff reported to N.P. Smith that she was still feeling depressed, but that she had been sleeping well. (R. at 463.) N.P. Smith noted that she had a blunted affect. (Id.)

- On October 19, 2010, Plaintiff reported to a professional at Northwood that she still continued to experience depression. (R. at 468.) She also reported low energy, poor concentration, racing thoughts, and poor social skills. (Id.)

- On October 29, 2010, Plaintiff reported to N.P. Smith that she was feeling depressed and anxious. (R. at 470.) She stated that she was sleeping a lot, preferred to isolate herself, and was ready to change antidepressants. (Id.) N.P. Smith found that Plaintiff had normal speech and activity levels and a blunted affect. (Id.)

The evidence from Northwood from the time period after Drs. Comer and Shaver rendered

---

[1] Dr. Comer notes that this evidence is from a follow-up appointment at Northwood on July 19, 2010. (R. at 492.) However, Plaintiff did not present to Northwood on July 19, 2010, and the cited evidence is identical to that in the notes from her appointment at Northwood on July 9, 2010.

their opinions demonstrates that Plaintiff continued to experience depression, anxiety, and social limitations.  For example:

- On January 28, 2011, Plaintiff reported to N.P. Smith that she was sleeping well but still feeling depressed and irritable.  (R. at 587.)  She stated that she had been active and busy with taking care of her residence.  (Id.)  N.P. Smith found that Plaintiff was cooperative, had a tearful affect, and was "maintaining baseline."  (Id.)

- On February 2, 2011, Plaintiff reported during an individual counseling session with Ms. Kidwell that she had been feeling severely depressed and was experiencing poor sleep and poor concentration.  (R. at 586.)  She noted that despite issues with her family, most days she enjoyed living at her son's house.  (Id.)  Ms. Kidwell noted that Plaintiff had normal speech and affect.  (Id.)

- On February 18, 2011, Plaintiff reported to Ms. Kidwell during an individual counseling session that she was still experiencing symptoms of anxiety because she was starting to get ready to obtain housing of her own.  (R. at 585.)  Ms. Kidwell noted that during the session, Plaintiff was not rocking back and forth and was "very limited" in tears.  (Id.)  She also stated that Plaintiff had normal mood, speech, and affect.  (Id.)  Also on that date, Plaintiff reported to N.P. Smith that she was feeling anxious, but denied irritability or agitation.  (R. at 584.)  Plaintiff noted that she had been feeling calmer and was experiencing less rocking and crying.  (Id.)  N.P. Smith noted that Plaintiff was "actually excited" about moving into her own apartment and that she was making progress.  (Id.)

- On March 18, 2011, Plaintiff reported to N.P. Smith that she was feeling depressed because of the two-year anniversary of her grandson's death.  (R. at 583.)  However, she stated that she was feeling less depressed and anxious and was crying less since she began her medications.  (Id.)  N.P. Smith noted that Plaintiff stayed busy and active during the day, was more optimistic, and was "maintaining baseline."  (Id.)

- On May 2, 2011, Plaintiff reported to both Ms. Kidwell and Dr. Corder that she was feeling depressed, anxious, and irritable.  (R. at 581-82.)  She reported that she could not leave her house because of increasing levels of anxiety.  (Id.)  Dr. Corder noted that Plaintiff appeared "in good spirits" regardless of her irritable and labile affect.  (R. at 581.)  He assessed "no acute symptoms."  (Id.)

- On May 23, 2011, Plaintiff reported to N.P. Smith that she was feeling depressed and irritable and did not want to leave her house.  (R. at 580.)  She denied shaking, rocking, and crying spells.  (Id.)  N.P. Smith determined that Plaintiff was making progress.  (Id.)

- On July 15, 2011, Plaintiff reported to Ms. Kidwell that she had been settling in her new place and liked it a lot.  (R. at 570.)  She went for walks at times, but at other times would

sit in her apartment and isolate herself. (Id.) Ms. Kidwell recommended professional therapy by Plaintiff refused it. (Id.) That same day, N.P. Smith assessed depression and anxiety. (R. at 569.)

- On August 10, 2011, Plaintiff reported to N.P. Smith that she had been sleeping well and had a normal energy level. (R. at 568.) She noted that she had developed a better relationship with her mother, was content about living alone, and could tolerate her family. (Id.) Plaintiff planned to go to a family outing. (Id.) N.P. Smith noted that Plaintiff was making progress. (Id.)

- On September 7, 2011, Plaintiff reported to N.P. Smith that she was feeling depressed and irritable because her daughter and grandchildren had temporarily moved in with her. (R. at 567.) However, she thought she would feel better when her family moved out. (Id.) N.P. Smith noted that Plaintiff had a normal affect despite her "situational difficulties." (Id.)

- On October 14, 2011, Plaintiff reported to N.P. Smith that she was feeling depressed, anxious, and irritable for no known reason. (R. at 556.) She felt overwhelmed about her daughter and grandchildren staying with her until they obtained their own apartment. (Id.) N.P. Smith assessed depression. (Id.)

- On October 28, 2011, Plaintiff reported to N.P. Smith that she was feeling anxious and irritable because of her family living with her. (R. at 555.) She noted that she had been experiencing racing thoughts, frequent mood swings, and poor focus and concentration. (Id.) N.P. Smith noted that Plaintiff was experiencing situational difficulties and mood instability. (Id.)

- On November 11, 2011, Plaintiff reported to N.P. Smith that she was feeling anxious, irritable, and depressed because of her family staying with her. (R. at 554.) She noted that all her symptoms seemed worse from a new medication. (Id.)

- On November 29, 2011, Plaintiff reported to Dr. Corder that she was feeling depressed and anxious. (R. at 637.) She noted that after being taken off Risperdal, she spent time lying in bed having racing thoughts about her grandson's death. (Id.) Plaintiff stated that she rocked "all the time, all day long." (Id.) Dr. Corder noted that she had slowed motor activity and a restricted affect. (Id.) He assessed "[i]ntrusive deprsessive [sic] thoughts and recollections." (Id.)

- On January 2, 2012, Plaintiff reported to N.P. Smith that she was feeling depressed but had a normal energy level. (R. at 624.) She noted that she was still dealing with grief but had no noticeable mood swings. (Id.) Plaintiff stated that she was experiencing less stress because she was living alone again. (Id.) N.P. Smith noted that Plaintiff was making progress. (Id.)

- On January 30, 2012, Plaintiff reported to N.P. Smith that she was feeling depressed and anxious. (R. at 623.) She noted that when she goes to stores, she feels shaky and doesn't want to be around people. (Id.) She was focused on her disability hearing and was concerned that "social phobia" be noted on her diagnoses. (Id.) Plaintiff stated that she communicated with her family by telephone, but that she had been staying at home to do housework and watch television. (Id.) N.P. Smith assessed that Plaintiff was maintaining baseline. (Id.)

Contrary to Plaintiff's argument, this evidence does not document "significantly more restrictions and more severe limitations than reflected in the residual functional capacity." (Plaintiff's Brief at 6.) Rather, the undersigned finds that these records from Northwood show that Plaintiff continued to experience depression and anxiety, especially in her social functioning. At no time did the treating professionals at Northwood assess more severe restrictions or limitations, and Plaintiff does not detail what "significantly more restrictions and more severe limitations" were reflected in these records. Accordingly, the undersigned finds that the ALJ's decision to accord "great weight" to Drs. Comer's and Shaver's opinions was proper, even though they were not based on a review of the entire administrative record.

Plaintiff also takes issue with the ALJ's rejection of the GAF score of 45 that Dr. Rush assigned to Plaintiff, as she alleges that the GAF scores "are consistent with the record as a whole and reflect [her] continuing significant mental limitations." (Plaintiff's Brief at 7.) However, the undersigned has already found that the ALJ properly assigned little weight to all GAF scores included in the record. Furthermore, at no point in her report did Dr. Rush suggest that Plaintiff had any mental limitations that precluded her ability to work. (See R. at 471-75); see also Camp, 103 F. App'x at 354; Ward, 2008 WL 1994978, at *3.

The ALJ also properly noted that the GAF score of 45 assigned to Plaintiff by Dr. Rush was inconsistent with Plaintiff's activities of daily living. A GAF score of 45 indicates: "**Serious**

**symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). DSM-IV at 32. However, in her Adult Function Report, Plaintiff reported that she did dishes and laundry and sometimes made dinner. (R. at 163, 184.) She also spent time with others if they visited her at her son's home, and regularly left the house to attend appointments at Northwood and with her probation officer. (Id. at 166.) Furthermore, on May 2, 2011, Plaintiff told Ms. Kidwell, her counselor at Northwood, that she would go out to buy groceries and had participated in a "Walk for Cancer" for her grandson. (Id. at 582.) On July 5, 2011, Plaintiff reported to N.P. Smith at Northwood that she had been trying to "get out" and take walks. (Id. at 569.) The undersigned finds that these reported activities are inconsistent with a GAF score of 45.

In sum, although the opinions of State agency consultants Drs. Comer and Shaver were not based upon a review of the entire administrative record, they are consistent with the record as a whole. Furthermore, although Dr. Rush assigned a GAF score of 45 to Plaintiff, the ALJ properly rejected that score because it was inconsistent with Plaintiff's reported activities of daily living. Likewise, Dr. Rush never opined that Plaintiff's mental limitations precluded her ability to work. Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision to assign greater weight to the opinions of Drs. Comer and Shaver than the consultative examination performed by Dr. Rush.

## V. RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Judgment on the

Pleadings be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _13_ day of _March_, 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE